UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CELESTE STINSON,<br><br>                    Plaintiff,<br><br>   v.<br><br>MORNINGSTAR CREDIT RATINGS, LLC,<br><br>                    Defendant. | **COMPLAINT**<br><br>Civ. Action No. 22-CV-_____<br><br>Jury Trial Demanded |

Plaintiff Celeste Stinson, by her attorneys Giskan Solotaroff & Anderson LLP, for her Complaint against Defendant Morningstar Credit Ratings, LLC, alleges as follows:

### PRELIMINARY STATEMENT

1. This is an action for age discrimination, gender discrimination, and retaliation in violation of the Age Discrimination in Employment Act ("ADEA"), Title VII of the Civil Rights Act ("Title VII"), and the New York City Human Rights Law ("NYCHRL"), on behalf of Plaintiff Celeste Stinson.

2. Ms. Stinson, a 65-year-old woman and an accomplished commercial real estate investment professional with over 30 years of experience in the real estate financing industry, worked at Morningstar Credit Ratings, LLC ("Morningstar" or "the Firm") for nearly 7 years as a senior analyst.

3. Morningstar discriminated against Ms. Stinson because of her age and gender, then retaliated against her for complaining about discrimination by placing her on a performance improvement plan and terminating her employment.

## THE PARTIES

4. Plaintiff Celeste Stinson resides in New Jersey.

5. Defendant Morningstar Credit Ratings, LLC, is a Pennsylvania limited liability company founded in 2007 with its principal place of business in New York, NY.

## VENUE AND JURISDICTION

6. This Court has jurisdiction over Plaintiff's ADEA and Title VII claims pursuant to 28 U.S.C. §§ 1331 (civil rights), 1332 (diversity), and 1343 (federal question).

7. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about August 5, 2020. The EEOC issued a Notice of Right to Sue to Plaintiff, attached as **Exhibit A**, which Plaintiff received on April 21, 2022.

8. This Court has jurisdiction over Plaintiff's claims under the NYCHRL pursuant to its supplemental jurisdiction, codified at 28 U.S.C. § 1367.

9. Venue is properly before this Court pursuant to 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to this action occurred in this District.

10. This Court has personal jurisdiction over Defendant because it operates and employed Plaintiff within New York State.

## FACTS

*Ms. Stinson's Background*

11. Plaintiff Celeste Stinson, a 65-year-old woman, is an accomplished commercial real estate investment professional with over 30 years of experience in the real estate financing industry. She holds a Master of Business Administration degree in Finance from New York University's Stern School of Business.

12. Prior to joining Morningstar in 2013, Ms. Stinson worked at the Federal Reserve Bank of New York and was responsible for an assigned portfolio of several large and complex high-profile commercial real estate mortgages. As part of her management and disposition strategy, one of her investment recommendations was ultimately approved by Mr. Timothy Geithner, who was then-U.S. Secretary of the Treasury, and Mr. Benjamin Bernanke in his capacity of the Chairman of the Federal Reserve.

13. Earlier in her career, Ms. Stinson held senior positions in financial institutions such as Guardian Life Insurance, GMAC, and Hypo Real Estate.

14. Ms. Stinson joined Morningstar's CMBS team as a Vice President, Senior Analyst, in the Firm's New York office, in June 2013. In that position, she was responsible for analyzing loans and credit metrics to assign ratings for new commercial mortgage-backed securities.

***The Culture of Misogyny at Morningstar***

15. At the time Ms. Stinson joined Morningstar and until 2018, all major decisions in her group were made out of the Firm's Horsham, Pennsylvania, office. The Horsham office was run by a group of men consisting of Managing Director Ken Cheng, Vice President Chandan Banerjee and Vice President Edward Dittmer, among others. Until 2018, Ms. Stinson reported to Mr. Banerjee, even though her office was located in New York City.

16. The men who ran the Horsham office, and who supervised Ms. Stinson in NYC, created a misogynistic "boys' club" culture, characterized by behaviors and actions such as:

      a. hiring and promoting men at the expense of better qualified women;

      b. assigning female analysts the least desirable complex projects with unrealistic deadlines;

    c. overloading women with work and constantly and unnecessarily criticizing them in an attempt to make them quit;

    d. excluding women from important decisions and meetings;

    e. denying women training key opportunities that would allow them to advance at work;

    f. treating women in a demeaning manner; and even

    g. placing women in the worst parts of the office.

17. While working at Morningstar, Ms. Stinson was subjected to all of the discriminatory acts described above.

18. Between 2013 and 2018, five women in Ms. Stinson's group resigned due to the unfair and discriminatory treatment they were subjected to as part of the "boys' club" culture.

19. In 2016, because of repeated complaints about gender discrimination and inequality, including an incident in which men in the Horsham office refused to allow a woman to sit at a conference table with them during a meeting, forcing her instead to sit in a side chair, Morningstar established a Women's Initiative Network, which was meant to support women in the workplace.

20. Unfortunately, the Women's Initiative Network turned out to be a sham. After Ms. Stinson raised the issue of unfair treatment at one of the group's meetings, she was retaliated against: when Morningstar moved offices, only a few months after she had raised the issue of unfair treatment, Mr. Cheng placed her in an isolated cubicle facing a dark corner, while his friends in the "boys' club" – Ms. Stinson's peers – were placed in workspaces facing floor-to-ceiling windows with breathtaking views of New York City. Before raising the issue of unfair treatment, Ms. Stinson had a workspace surrounded by windows and views of the city.

21. The members of the Horsham "boys' club" consistently treated Ms. Stinson in a disrespectful manner. For example, in December 2017, while Ms. Stinson was presenting her loan reviews during a conference call, members of the Horsham "boys' club" muted their conference line during her presentation and proceeded to make hateful and critical remarks about her among themselves. Ms. Stinson learned of this episode through a former colleague who was present in Horsham and witnessed the behavior.

22. Ms. Stinson's male managers also assigned her the most difficult and the least rewarding properties to analyze, such as skilled nursing homes, which were widely considered undesirable assignments. Indeed, in late 2017, when a new supervisor joined the team and began assigning new roles and responsibilities to Ms. Stinson's colleagues, Ms. Stinson asked what her role would be. The supervisor responded using the following vulgar language: "to underwrite the piece of shit deals in the middle of nowhere that no one else wants to touch."

23. Ms. Stinson was denied important career-advancing opportunities that were routinely given to similarly situated younger male colleagues. For example, from approximately 2014 to 2018, Ms. Stinson's male managers refused to give her training on Morningstar's subordination model, while younger men with the same title and qualifications received the training, thus allowing them to advance in their careers at the Firm. By contrast, Ms. Stinson was only permitted to perform underwriting and site visits.

24. In 2017, Morningstar replaced Mr. Cheng with a new Managing Director, Charles Citro, who was extremely competent and respected in the industry. Ms. Stinson was optimistic that things would change for the better. She got along well with Mr. Citro and openly supported his initiatives to make the office a fair and unbiased workplace.

25. Mr. Citro attempted to stop the "boys' club" from controlling all valuable internal information and break their monopoly of the training on the subordination model, which was preventing the women in the office from advancing in their careers.

26. Mr. Citro's attempts to change the office culture in Horsham did not sit well with the "boys' club." In mid-2017, while expressing his dislike of Mr. Citro and his plans to stop him, Mr. Dittmer suggested that, in order to determine who should be in charge in the office, they "put all [their] dicks on the table and see whose dick [was] the longest." This comment was one of many in which Mr. Dittmer showed his animus towards women, thus creating a hostile work environment.

27. During the same conversation, Mr. Dittmer and his male colleagues agreed that Ms. Stinson "will be thrown under the bus." The "boys' club" resentment of Ms. Stinson was not based on her performance at the Firm; rather, it was due to her age and gender.

28. As part of the plan to overthrow Mr. Citro in order to maintain a misogynistic culture, the "boys' club" waged a complaint campaign against Mr. Citro with Human Resources, causing him to be quickly terminated.

29. Mr. Citro was replaced by Lea Overby, who became the head of Ms. Stinson's group, and who had the support of the "boys' club" because she did not question or try to stop their misogyny.

30. In December 2017, several months after Mr. Citro was pushed out, Ms. Overby placed Ms. Stinson on a Performance Improvement Plan ("PIP"), thus advancing the sexist plan to throw her "under the bus."

31. However, Ms. Stinson was able to prove to Morningstar that the PIP was unwarranted and unnecessary. First, she provided a detailed response to the specific items in the

PIP. Then, the PIP was reviewed by an internal independent third party and was found "inconclusive." As a result, the PIP was removed and Ms. Stinson was assigned a new manager in place of Mr. Banerjee.

32. In spite of all this, Ms. Stinson's 2017 bonus was still cut by more than 85% (from $27,349 to $4,000).

33. Ms. Stinson's new manager, who was the only other female Vice President/senior analyst on the team and who had also been subjected to similar treatment by the "boys' club," resigned after learning about the male managers' treatment of Ms. Stinson, the PIP process, and the cut to her bonus, all of which she felt were grossly inappropriate.

34. In 2018, the misogynistic behavior in Horsham continued unabated.

35. In around February 2018, after Ms. Stinson was already off the PIP, she attended a managers' meeting via a conference call, along with team members from the New York, Horsham, Chicago, and Mumbai, India offices. After the substantive part of the call ended, Ms. Stinson, along with other members of the team, remained on the line. During this portion of the call, Ms. Overby reassigned Ms. Stinson to a new manager, Luke Trainer, who was another member of the "boys' club." Mr. Trainer immediately responded by exclaiming, "What the fuck? Why do I have to deal with her?" Ms. Overby replied she knew Ms. Stinson was a problem and that Mr. Trainer should "document, document, document," and that she would make sure he had resources to deal with Ms. Stinson. Ms. Stinson was deeply embarrassed and angered to hear that her colleagues were trying to find ways to get rid of her.

36. On another occasion in early 2018, Ms. Stinson overhead Ms. Overby discussing a job candidate, stating the applicant was "way too old" because "she was at Lehman Brothers, for Heaven's sake!"

7

37. Other examples of sexism and ageism that Ms. Stinson experienced or witnessed at Morningstar included:

    a. Being excluded from a team dinner to which her younger colleagues were invited in mid-2018. The only other person who was also excluded from the dinner was, like Ms. Stinson, over the age of 60.

    b. Ms. Overby refused to allow Ms. Stinson to use her educational stipend to attend an after-work presentation on collateralized loan obligations, a relevant topic in the CMBS industry, while allowing a younger colleague to attend the same presentation.

    c. The Horsham "boys' club" spread a sexist rumor that a female colleague was gay, when they had no reason to know anything about this colleague's true sexual orientation, but rather began the rumor as an insult to her femininity.

    d. Permitting Ms. Stinson's male colleague to work from home three days a week but denying the same privilege to Ms. Stinson.

*Ms. Stinson's Complaints of Discrimination*

38. In early 2018, Ms. Stinson complained to Morningstar's Head of Global Research, Haywood Kelly, based in Chicago, that the PIP was unfair and discriminatory (based on her age and gender). Mr. Kelly expressed concern regarding her complaint and asked Ms. Stinson what she considered to be appropriate discipline for the "boys' club." Ms. Stinson suggested that the Horsham office be shut down.

39. In the summer of 2018, Ms. Overby and Mr. Dittmer left the Firm. Mr. Dittmer went to work for Morningstar's competitor, DBRS. Morningstar also announced that it would be

closing the Horsham office, and that Horsham-based employees would be expected to work in the NYC office going forward.

40. In August 2018, Ms. Stinson sent a detailed complaint to Morningstar's new President, Brian Grow, describing the age and sex discrimination that she had been subjected to by the male managers in Horsham, as well as the continued hostile work environment that the "boys' club" nurtured.

41. In September 2018, in response to her complaint to Mr. Grow, Ms. Stinson met with in-house employment counsel and a Human Resources representative. Ms. Stinson reiterated her complaints, including Mr. Dittmer's sexist comment about measuring male genitalia. In response, they stated that Mr. Dittmer and Ms. Overby had left the Firm and that the Horsham office would soon be closing, so there was no need for further action on their part.

42. In January 2019, when the Firm closed the Horsham office and Ms. Stinson started reporting to Morningstar's NYC office, the Firm assigned her to a new manager, Gordon Sinclair, who was fair, respected Ms. Stinson's work, and gave her good feedback.

***Morningstar Retaliates Against Ms. Stinson at the First Possible Opportunity***

43. In June 2019, Morningstar acquired DBRS and brought back Mr. Dittmer, a former Horsham "boys' club" member, and named him head of Ms. Stinson's CMBS team in the NYC office. After that, things turned for the worse for Ms. Stinson again.

44. In August 2019, before Mr. Dittmer officially assumed his role as the head of Ms. Stinson's group, Ms. Stinson raised concerns about him with the North American Head of CMBS, Erin Stafford (who also came from DBRS) and another Managing Director, Kurt Pollem, who had replaced Ms. Overby. Ms. Stinson explained to them the discriminatory behavior she had been subjected to by Mr. Dittmer and the Horsham "boys' club," and described Mr.

9

Dittmer's sexist comment about measuring male genitalia, along with his stated intention to throw her "under the bus."

46. Mr. Pollem responded by that, though he found Mr. Dittmer's past behavior unacceptable, there was nothing to be done at this point, but otherwise failed to address Ms. Stinson's complaint. Ms. Stafford responded that she was aware of the "crude and rough" behavior that had been happening in the Horsham office and had talked to Mr. Dittmer to let him know that such behavior would not be tolerated in his new role.

46. Despite these assurances, in around August 2019, when Mr. Dittmer started in his role as head of CMBS in the NYC office and became Ms. Stinson's superior, it immediately became clear to her that Mr. Dittmer's plan was to push her out.

47. Around that time, Ms. Stinson's supervisor, Mr. Sinclair, overheard Mr. Dittmer tell two male employees: "I am making a file on Celeste, so if you have stuff, send it to me." Mr. Sinclair also informed Ms. Stinson that his recommendation for her to attend a training in Chicago on a new model that the team was expected to use had been rejected. Male colleagues with the same title and qualifications as Ms. Stinson were permitted to attend the training in Chicago. (The Firm terminated Mr. Sinclair's employment about a month later without any explanation.)

48. On February 6, 2020, Mr. Dittmer placed Ms. Stinson on another unfounded and unfair PIP.

49. On March 5, 2020, Ms. Stinson was notified that her employment would be terminated on March 20, 2020.

*Further Evidence of Age Discrimination*

50. On March 13, 2020, the weekly industry newsletter announced that the DBRS Morningstar CMBS team was looking to add 3-4 junior analysts, with 1-3 years of experience.

51. Ms. Stinson later learned that Morningstar hired a number of young analysts in their 20's to perform the exact work Ms. Stinson was responsible for while employed at Morningstar, *i.e.*, analyzing loans and credit metrics to assign ratings to new CMBS.

52. By contrast, a former colleague of Ms. Stinson who is in his 60s and who had been performing the same work as Ms. Stinson, is no longer dealing with new CMBS transactions and has been transferred to the surveillance team in the back office that worked out of Horsham.

53. Morningstar had previously indicated its preference for hiring younger workers when, during a meeting in July 2019, Ms. Stafford had stated that future employment decisions would be focused on employees' "potential rather than experience," which is a coded language for age discrimination.

54. Ms. Stinson's termination was caused by her complaints of age and sex discrimination against Mr. Dittmer and the Horsham "boys' club."

55. As a direct result of the discrimination and retaliation described above, Ms. Stinson has suffered damages including, but not limited to, lost past and future income, reputational damage, and severe emotional distress.

## THE CONTINUING VIOLATIONS DOCTRINE

56. Plaintiff's claims are not merely limited to the three-year statute of limitations, as measured from the time Plaintiff filed her Charge of Discrimination with the EEOC, on August 5, 2020. The acts of age and gender discrimination that took place more than three years prior to

her termination on March 20, 2020, were, in fact, part of an ongoing pattern and/or policy of sexual harassment, gender discrimination, age discrimination, and the creation of a hostile work environment at Morningstar and, therefore, are also timely under the continuing violation doctrine.

**FIRST CLAIM FOR RELIEF**
(Sex Discrimination in Violation of Title VII)

57. Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs above as if fully set forth herein.

58. Defendant subjected Plaintiff to a hostile work environment and discriminated against her in the terms and conditions of her employment on account of her sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

**SECOND CLAIM FOR RELIEF**
(Retaliation in Violation of Title VII)

59. Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs above as if fully set forth herein.

60. Defendants retaliated against Plaintiff by terminating her employment in retaliation for her complaints of sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

**THIRD CLAIM FOR RELIEF**
(Age Discrimination in Violation of ADEA)

61. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs above as if fully set forth herein.

62. Defendant discriminated against Plaintiffs in the terms and conditions of their employment based on their ages in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621.

### FOURTH CLAIM FOR RELIEF
(Retaliation in Violation of ADEA)

63. Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs above as if fully set forth herein.

64. Defendants retaliated against Plaintiff by terminating her employment in retaliation for her complaints of age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621.

### FIFTH CLAIM FOR RELIEF
(Sex Discrimination in Violation of NYCHRL)

65. Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs above as if fully set forth herein.

66. Defendant subjected Plaintiff to a hostile work environment and discriminated against her in the terms and conditions of her employment on account of her sex in violation of the Administrative Code of the City of New York § 8-107 *et seq*.

### SIXTH CLAIM FOR RELIEF
(Age Discrimination in Violation of NYCHRL)

67. Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs above as if fully set forth herein.

68. Defendant discriminated against Plaintiff in the terms and conditions of her employment on account of her age in violation of the Administrative Code of the City of New York § 8-107 *et seq*.

## SEVENTH CLAIM FOR RELIEF
(Retaliation in Violation of NYCHRL)

69. Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs above as if fully set forth herein.

70. Defendants retaliated against Plaintiff by terminating her employment in retaliation for her complaints of sex and age discrimination in violation of the Administrative Code of the City of New York § 8-107 *et seq*.

WHEREFORE, Plaintiff demands judgment:

A. Reinstating Plaintiff's employment and enjoining Defendant from harassing Plaintiff on the basis of her age or gender, or retaliating against her for her complaints of discrimination, in the terms and conditions of her employment;

B. Awarding Plaintiff back pay;

C. Awarding Plaintiff compensatory damages, including but not limited to damages for emotional distress;

D. Awarding Plaintiff punitive damages;

E. Awarding reasonable attorneys' fees, costs, and expenses; and

Granting such other legal and equitable relief to the Plaintiff as the Court may deem just and equitable.

## JURY DEMAND

Plaintiff demands trial by jury of all issues as of right.

Dated:     New York, New York
             July 20, 2022

                        **GISKAN, SOLOTAROFF & ANDERSON LLP**

By:     Amy E. Robinson
        90 Broad Street, 2nd Floor
        New York, New York 10004
        646-964-9609
        arobinson@gslawny.com
        *ATTORNEYS FOR PLAINTIFFS*