UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CELESTE STINSON,

                              Plaintiff,

          -against-

MORNINGSTAR CREDIT RATINGS, LLC,

                              Defendant.

Case No. 1:22-cv-06164 (JLR)

**<u>OPINION AND ORDER</u>**

JENNIFER L. ROCHON, United States District Judge:

Celeste Stinson worked as a senior credit analyst for Morningstar Credit Ratings, LLC ("Morningstar").  She brings discrimination, retaliation, and hostile-work-environment claims against Morningstar under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* (the "ADEA"); the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* (the "NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* (the "NYCHRL").[1]  Morningstar moves for summary judgment on all of Stinson's claims.  For the following reasons, Morningstar's motion is granted in part and denied in part.

---

[1] Stinson's operative complaint makes no mention of the NYSHRL.  *See generally* Dkt. 1 ("Compl.").  However, both parties have referred to Stinson's NYSHRL claims throughout this litigation.  *See, e.g.*, Dkt. 40 ("Br.") at 18; Dkt. 60 ("Opp.") at 10; Dkt. 30 at 1 (pre-motion letter).  Therefore, the Court will presume for the purposes of this motion that Stinson brings claims under the NYSHRL for discrimination, retaliation, and a hostile work environment.

# BACKGROUND

## I.   Factual Background[2]

### A.  Stinson Joins Morningstar

Stinson was 56 years old when she began working at Morningstar in 2013 as a Vice President, Senior Credit Analyst.  JSOF ¶ 1; Pl. RSOF ¶¶ 1-2.  Stinson worked in the New York office, and her responsibilities included reviewing, underwriting, and analyzing market data and writing pre-sales and asset-summary reviews.  JSOF ¶¶ 2-3.  Stinson reported not only to her direct managers but also to various Senior Vice Presidents on different assignments.  *Id.* ¶ 4.[3]

Stinson asserts that her managers, who worked out of the company's office in Horsham,

---

[2] The Court draws its account of the facts of this case from the parties' submissions in support of and in opposition to Morningstar's motion for summary judgment, including the parties' joint statement of undisputed facts, Dkt. 42 ("JSOF"); Morningstar's Local Rule 56.1 statement, Dkt. 41; the declaration of Rachel S. Fischer and accompanying exhibits, Dkt. 43; the declaration of Karen Hogue and accompanying exhibits, Dkt. 44; Stinson's reply to Morningstar's Local Rule 56.1 statement and counter-statement, Dkt. 55 ("Pl. RSOF"); the declaration of Stinson, Dkt. 56; the declaration of Gordon Sinclair, Dkt. 57; the declaration of Amy E. Robinson and accompanying exhibits, Dkt. 58; and Morningstar's reply to Stinson's 56.1 counter-statement, Dkt. 64 ("Df. RSOF").

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and are denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court deems such facts true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically denied and controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . denying and controverting any statement of material fact[] must be followed by citation to evidence which would be admissible and set forth as required by Fed. R. Civ. P. 56(c).").

[3] Stinson had several direct managers throughout her time at Morningstar.  From June 2013 to April 2014, she reported to Sheila Bjornstad.  Df. RSOF ¶ 193.  From May 2014 to January 2018, she reported to Chandan Banerjee.  *Id.* ¶ 195.  From February to March 2018, she reported to Molly Maghran.  *Id.* ¶ 196.  From March to September 2018, she reported to Luke Trainer.  *Id.* ¶ 198.  From October 2018 to January 2019, she reported to Robert Grenda.  *Id.* ¶ 199.  From

Pennsylvania, "created a misogynistic 'boys' club' culture that generally favored men over women." Df. RSOF ¶ 206.  The instances of harassment by men in the Horsham office from June 2013 through the end of 2017 that she witnessed or experienced include the following:

- In 2014 or 2015, one male colleague stated, in reference to not tidying up after himself, that "women keep the kitchen clean." *Id.* ¶ 219.

- In 2015 or 2016, after Stinson was assigned to lead a particular deal, another male colleague told her that she was allowed to lead the deal only "because they're impossible to fuck up." *Id.* ¶ 220 (brackets omitted).

- In 2016, the same colleague asked her about underwriting mobile-home parks as a sarcastic reference to the fact that Stinson is from Tennessee and speaks with a Southern accent.  *Id.* ¶ 221.

- In the summer of 2017, when Stinson demonstrated a function on Microsoft Excel during a loan-review meeting, that colleague said "you can teach an old dog new tricks." *Id.* ¶ 224.

- In late 2017, a new supervisor told Stinson that her role was "to underwrite the piece of shit deals in the middle of nowhere that no one else wants to touch." *Id.* ¶¶ 209-210.

Stinson also claims the men in Horsham criticized the work of women more harshly than that of their male colleagues, and that they were mean and disrespectful to female analysts. *Id.* ¶¶ 211-212.  Stinson states that her male managers often assigned her to "undesirable" work, such as underwriting skilled nursing homes.  *Id.* ¶ 208.  She claims that the men in the Horsham office started a rumor that one coworker, Sheila Bjornstad, was a lesbian because she was single and in her forties, and that they made other crude comments about the coworker's appearance and sexuality.  *Id.* ¶¶ 215, 217-218.  Morningstar objects to these statements as inadmissible hearsay and speculation, noting that Stinson fails in some instances to identify the speaker

---

January to October 2019, she reported to Gordon Sinclair.  *Id.* ¶ 200.  From November 2019 to her termination in March 2020, she reported to Audrey Lee.  *Id.* ¶ 203.

behind certain acts.  *See id.* ¶¶ 209-212, 215-221, 224-226.

### B.  Stinson Receives Negative Feedback

Between June 2013 and the end of 2017, Stinson received performance evaluations that highlighted deficiencies.  JSOF ¶ 10.  In Stinson's performance review for the third quarter of 2016, Robert Grenda told Stinson that her performance was inconsistent and that she was often unprepared to answer basic or foreseeable questions.  Pl. RSOF ¶ 18.  Grenda noted times when Stinson failed to meet deadlines.  *Id.*  The "areas for improvement" in Stinson's written review included feedback that Stinson "has a tendency to blame others for her shortcomings and when errors or problems arise," and that she needed to "[b]e prepared for all loan review presentations", "spend more time studying [Commercial Mortgage Backed Securities ("CMBS")] concepts and deal structures", and "accept constructive criticism and learn from the feedback that others are providing."  Dkt. 43-4 at 2; *see* Pl. RSOF ¶ 18.

In her year-end performance review for 2016, Stinson received feedback that "she often fails to communicate with managers and with associates, which led to some problems meeting deadlines"; "sometimes delegates too much to the associates"; and "is too concerned with office politics."  Pl. RSOF ¶ 19; Dkt. 43-5 at 2.  The review added that Stinson "is sometimes not well prepared for review meetings"; "[n]eeds to communicate better with managers and be more willing to get her hands dirty by performing certain tasks herself"; "tends to delegate too much and then not check to ensure that tasks are completed correctly"; and "needs to improve her knowledge of the CMBS sector, particularly deal structures, pricing spreads, investor areas of concern."  Dkt. 43-5 at 2-3; *see* Pl. RSOF ¶ 20.  Grenda told Stinson in March 2017 that she sometimes did not meet her deadlines.  Pl. RSOF ¶ 21.  He urged her to be prepared at all times for loan presentations and to communicate with her managers about her workload.  *Id.*

In July 2017, Grenda and Banerjee provided more "critical feedback."  *Id.* ¶¶ 22-23.

They noted several shortcomings in Stinson's work on a project, including an "apparent lack of understanding of the transaction structure, underwriting that was not well thought out, . . . a lack of footnotes and explanations of underwriting adjustments and/or assumptions[,]" and "severely limited" Microsoft Excel skills.  *Id.* ¶ 23.  Later that month, Stinson received an email from Grenda and Banerjee with more "critical feedback about . . . being unprepared for a loan review meeting, demonstrating a lack of understanding for underwriting templates, being unfamiliar with Company methodology, having a general lack of attention to detail, not being available for meetings, and not incorporating comments and feedback." *Id.* ¶ 24.  The email ended with a warning that, "[a]t this point, you are not meeting our expectations for a senior analyst, and these items need to be addressed immediately." *Id.* ¶ 25.

On August 10, 2017, Stinson complained to Karen Hogue, a Talent & Culture ("T&C") business partner that she was "nitpicked" for small mistakes, subjected to unreasonable deadlines, and regularly belittled. *Id.* ¶ 26.  The parties dispute whether Stinson also complained of discrimination. *Id.*  Stinson claims that she complained that women were not valued in her group and framed her complaints as examples of being treated worse than her male and younger colleagues. *Id.*  Hogue did not tell anyone outside of Morningstar's T&C or legal departments about her discussion with Stinson. *Id.* ¶ 27.

### C.  Stinson's First PIP

In September 2017, Stinson's supervisor Lea Overby – then the head of CMBS research and analytics – told Hogue that she wanted to place Stinson on a performance improvement plan (a "PIP") due to concerns with Stinson's performance. *Id.* ¶ 29.  Over the next two months, Hogue received further feedback documenting instances of Stinson's poor work. *See id.* ¶¶ 30-34.

On December 4, 2017, Overby placed Stinson on a PIP (the "2017 PIP").  Df. RSOF

¶ 244; *see* Dkt. 43-9.  Shortly before placing Stinson on this PIP, Overby stated in an email that "we are officially putting Celeste on a PIP on Monday" and that "we would like to see her gone shortly after the end of the one-month PIP."  Df. RSOF ¶ 246.  The PIP noted several areas in which Stinson's performance was deficient, including poor communication; substandard work quality; lack of attention to detail; lack of proficiency with Microsoft Excel; lack of understanding of functionality with underwriting templates; not following directions; and not meeting deadlines.  Pl. RSOF ¶ 35.

Stinson protested her PIP twice.  First, on December 14, 2017, she and several of her colleagues spoke with Hogue.  *Id.* ¶ 37.  During that meeting, Stinson alleged that she had been issued the PIP in retaliation for her complaints to Hogue in August 2017.  JSOF ¶ 14.  Second, on January 12, 2018, Stinson sent Haywood Kelly, Morningstar's head of research, a response to her PIP in which she complained that the PIP was "fraudulent" and "illegally motivated by [her] gender and age."  *Id.*; *see* Dkt. 43-13 at 3.  In this letter, Stinson alleged that Overby had discriminated against Stinson due to her age.  JSOF ¶ 15.  She also alleged that her team was controlled by a group of men in the Horsham office who aimed to hire and promote other men while trying to have women on the team fail or quit by overloading them with work and criticizing them.  Pl. RSOF ¶ 43.

On January 17, 2018, Stinson spoke with Hogue and Kelly about her complaints.  *Id.* ¶ 48.  Stinson said that, in 2017, one colleague in the Horsham office, Edward Dittmer, told Stinson to tell a former female colleague to "fuck off" if Stinson saw her.  *Id.* ¶ 51; *see* Df. RSOF ¶ 225.  She also said the Horsham office would "put [the] phone on mute and make fun of her."  Pl. RSOF ¶ 52.  Kelly said Morningstar was taking her PIP rebuttal letter seriously and working

with a third party to investigate.  *Id.* ¶ 49.

Stinson followed up in writing with additional details on her allegations.  JSOF ¶ 18.
Stinson alleged that Overby had pointed to a seating chart and said, purportedly in reference to
her, that "that one will be going away."  *Id.* ¶ 20.  Stinson also alleged that she heard Overby
discussing of a female job candidate: "No!  She's way too old!  She was a vice president at
Lehman Brothers, for heaven's sake!"  *Id.*  According to Stinson, Overby offered the position to
a younger man, who declined the offer, before offering it to the woman, who accepted it.  *Id.*

Upon investigating, Hogue did not find merit to the age- and sex-discrimination claims
raised during Stinson's December 2017 call and in her January 2018 letter.  Pl. RSOF ¶¶ 47, 59.
A former member of Morningstar's quality and compliance team also reviewed Stinson's PIP
and her response and found the PIP inconclusive.  *Id.* ¶ 55.  Hogue and Kelly shared these
findings with Stinson on February 2, 2018.  *Id.* ¶ 60.  Hogue indicated that while the PIP was not
conclusive enough to terminate Stinson's employment, it did not mean that Stinson had no
performance issues.  *See id.* ¶ 61; JSOF ¶ 22.

### D.  Allegations of Post-PIP Harassment

On February 26, 2018, Stinson learned that her annual bonus, which is discretionary at
Morningstar, would be $4,000 – much less than she had anticipated.  *Id.*  ¶¶ 24-25; *see* Df. RSOF
¶ 272.  Stinson believed that Morningstar had no rational basis to cut her bonus other than
Overby's desire to save her budget for others.  Pl. RSOF ¶ 65.

In late February 2018, Stinson attended a managers' meeting via conference call.  Df.
RSOF ¶ 277.  After the substantive part of the call ended, Stinson, along with other members of
the team, remained on the line.  *Id.* ¶ 278.  Stinson claims she heard Overby reassign Stinson to a
new manager, Luke Trainer, who responded, "What the fuck?  Why do I have to deal with her?"
*Id.* ¶¶ 279-280.  Stinson claims that Overby replied that she knew that Stinson was a problem and

that Trainer should "document, document, document" his dealings with her.  *Id.* ¶ 281.

Stinson claims that, in July 2018, another colleague told her of a conversation from the summer of 2017 among the colleague, Dittmer, and Banerjee.  Df. RSOF ¶¶ 316-317.  She claims that the conversation focused on a "power struggle" within their team at the time.  *Id.* ¶ 318.  According to Stinson, Dittmer suggested that, to determine who should lead the team, they "all put their dicks on the table and see whose dick was the longest."  *Id.* ¶ 319.  He also apparently stated during this conversation that Stinson "will be thrown under the bus."  *Id.* ¶ 320.[4]

On August 17, 2018, Stinson wrote to Morningstar's president, Brian Grow, that her 2017 PIP was motivated by age and gender discrimination.  JSOF ¶ 26; *see* Dkt. 43-19.  Stinson alleged that her bonus was lowered because she complained of discrimination.  JSOF ¶ 26.  She also alleged that Overby had excluded her from a team dinner, denied her request to use an educational stipend, and assigned her an excessive workload.  Dkt. 43-19 at 4-6.  Grow forwarded Stinson's letter to Hogue and Leslie Mullins, another T&C business partner covering Stinson's team.  JSOF ¶¶ 27, 29.  Hogue did not see a need to investigate many of the allegations in this letter because they duplicated the complaints that she had already investigated that year.  Pl. RSOF ¶ 69.  She did, however, investigate the new allegations.  *Id.*

---

[4] The Court agrees with Morningstar that Stinson presents no evidence of this conversation allegedly heard by her co-worker.  She provides only hearsay that the co-worker told her that Dittmer said these things.  *See* Fed. R. Evid. 801(c), 802.  Without admissible evidence that this conversation happened, the Court considers only the fact that the co-worker recounted a conversation to Stinson, and what effect this telling might have had on Stinson.  *See Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) ("Only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." (brackets and citation omitted)); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008) ("In ruling on a motion for summary judgment, the district court may rely on any material that would be admissible or usable at trial." (quotation marks and citation omitted)).

On September 7, 2018, Hogue interviewed Stinson's then-manager Luke Trainer, who said Stinson was "average at best" and did not perform at the level expected of someone with her experience, pay, or title. *Id.* ¶¶ 70-71. Trainer added that her personality was a problem and that she was passive-aggressive with her managers. *Id.* Trainer noted Stinson's opinion that the Horsham team was "against" her but said he felt that everyone was treated equally and that Stinson was assigned the same amount of work, if not less, as others. *Id.*

Stinson met with Mullins and Lisa McGarrity (Morningstar's in-house employment counsel) on September 11, 2018. *Id.* ¶ 78. At the meeting, McGarrity said that she did not think there had been age or sex discrimination, that Morningstar would not revisit Stinson's 2017 bonus, and that Stinson should reach out if she had further concerns. *Id.* ¶ 81.

### E. Dittmer Becomes One of Stinson's Managers

Edward Dittmer worked out of the company's Horsham office from 2010 to 2018, when he left Morningstar to join another company, DBRS. JSOF ¶¶ 5, 9. Dittmer and Stinson worked on the same team from 2013 to 2014 but did not otherwise work with each other during this time. Pl. RSOF ¶¶ 11-13. Morningstar acquired DBRS in 2019. JSOF ¶ 31. At the time, Dittmer was a senior manager at DBRS. *Id.* ¶ 34.

Concerned that Dittmer would be named head of the combined DBRS-Morningstar New York group overseeing commercial mortgage-backed securities, Stinson claims that, in August or September 2019, she expressed her concerns about Dittmer to the North American Head of CMBS, Erin Stafford, and Managing Director Kurt Pollem. Df. RSOF ¶¶ 324, 326. She recounted her past interactions with Dittmer and the Horsham "boys' club," and she complained that Dittmer was inclined to terminate Stinson. *Id.* ¶ 327-28. Pollem responded that, although he found Dittmer's past behavior unacceptable, "there was nothing to be done at this point." *Id.* ¶ 329. Stafford responded that she was already aware of the language at issue and "had already

told Mr. Dittmer that such behavior would not be tolerated in his new role." *Id.* ¶ 330. Morningstar denies this exchange as inadmissible hearsay. *See id.* ¶¶ 324-330.

In August 2019, after the merger concluded, Dittmer became head of the New York CMBS group. JSOF ¶ 35. In this role, he oversaw three "deal leads" (also known as team leads), who each managed two to five people. *Id.* ¶¶ 37-38. He was one of Stinson's managers; she reported directly to Gordon Sinclair, who in turn reported to Dittmer as one of his deal leads. Pl. RSOF ¶¶ 94-95, 99.

In September 2019, Stinson asked to work from home. *Id.* ¶ 105; *see* Br. at 7; Dkt. 58-27. She had learned that one of her colleagues received permission to work from home in Horsham after the Horsham office closed in late 2018. Pl. RSOF ¶ 104; JSOF ¶¶ 41, 43-44. Understanding that Stinson's commute involved a short drive to the train station in northwestern New Jersey and a ride on the New Jersey Transit, Dittmer did not approve her request. Pl. RSOF ¶¶ 106-107.

### F. Stinson's Second PIP and Subsequent Termination

Stinson's managers took issue with Stinson's negative attitude on at least two occasions. On September 20, 2019, after questioning a staffing decision, Stinson forwarded Dittmer's response to Stafford with the note "Well Team Gordon is getting off to a rough start with Ditty. Nice smack in the face to us all. Not sure what Dittmer's goal is." *Id.* ¶ 108. On November 7, 2019, Stinson asked to shift some of her work to another analyst. *Id.* ¶ 109. When Dittmer asked why, Stinson listed other tasks on her agenda before closing with the sarcastic response: "Is there anything else I can do for you?" *Id.* Dittmer viewed this email as insubordinate. *Id.* ¶ 110. While Dittmer had not reviewed much of Stinson's work at this time, he believed that she demonstrated a lack of professionalism and had performance deficiencies. *Id.* ¶¶ 112-113, 116; JSOF ¶ 46. He also heard from a deal lead that Stinson had made significant mistakes on at least

two deals.  Pl. RSOF ¶ 114.

Other managers noted issues with Stinson's work around this time.  In Stinson's 2019 year-end Manager Alignment Survey, Pollem rated her a 1 out of 4 in five categories and a 2 out of 4 in three categories.  Pl. RSOF ¶ 125.  In his evaluation, Pollem also commented that Stinson "has produced bare minimum for VP role and should be doing much more," "appears limited in her ability to multitask," and "has openly been hostile with her manager, disagreeing with work process and work assigned to her."  *Id.* ¶ 126; *see* Dkt. 44-16.  For both 2018 and 2019, Stinson was rated an inconsistent performer.  Pl. RSOF ¶ 124; *see* Dkt. 43-29.

On January 29, 2020, deal lead Greg Haddad told Stinson that certain work needed to be completed at least one day before scheduled calls.  Pl. RSOF ¶ 127.  Stinson responded that she does not control the process and that Haddad should make the bank aware of his expectations.  *Id.* ¶ 128.  Dittmer forwarded the email to Stafford and Mullins, stating that Stinson's behavior would "no longer be tolerated."  *Id.* ¶ 129.  He felt Stinson's email was an inappropriate response to a manager that "smacked of insubordination" and indicated that he would write a PIP for Stinson that day.  *Id.* ¶¶ 129-130 (brackets and citation omitted).

On February 6, 2020, Stinson's manager Audrey Lee, Dittmer, and Mullins met with Stinson to deliver a second PIP.  *Id.* ¶ 49; *see* Dkt. 43-33 (the "2020 PIP").  The 2020 PIP noted at least three examples of Stinson's substandard performance and cited four examples of Stinson's unprofessional behavior, including her emails to Stafford, Dittmer, and Haddad.  2020 PIP.  After Stinson was placed on the 2020 PIP, she had weekly check-in meetings with her managers and T&C representatives.  JSOF ¶¶ 52-54, 56.  At each meeting, Stinson received negative feedback, the accuracy of which Stinson contests.  Pl. RSOF ¶¶ 143-144, 149.

On March 2, 2020, a team – comprised of Dittmer, Stafford, Mullins, Morningstar's

global head of T&C, and its global managing director, with advice from McGarrity – decided to terminate Stinson.  JSOF ¶¶ 57-58.  Stinson was terminated on March 5, 2020.  *Id.* ¶ 59.  Shortly before her termination, Stinson sent Kelly a letter complaining that her 2020 PIP was discriminatory and retaliatory.  *Id.* ¶ 60.  A representative from Morningstar's T&C team investigated Stinson's allegations.  *Id.* ¶ 61.  Stinson spoke with the representative and provided a written response to the PIP on March 18, 2020.  *Id.* ¶¶ 62-63; *see* Df. RSOF ¶ 365.  The T&C representative found the PIP justified.  Pl. RSOF ¶ 168.

## II.    Procedural History

On August 5, 2020, Stinson filed a charge with the U.S. Equal Employment Opportunity Commission (the "EEOC"), Dkt. 1 ("Compl.") ¶ 7, which Morningstar does not dispute, Br. at 24.  On April 21, 2022, the EEOC issued Stinson a Notice of Right to Sue.  *See generally* Dkt. 1-1; *see also Rusis v. Int'l Bus. Machs. Corp.*, 529 F. Supp. 3d 178, 201 (S.D.N.Y. 2021) ("Plaintiff's EEOC charge and the agency's determination are both public records, of which this Court may take judicial notice." (brackets and citation omitted)).

On July 20, 2022, Stinson initiated this lawsuit by filing a complaint against Morningstar.  *See generally* Compl.  Morningstar answered the complaint on October 3, 2022.  Dkt. 16 ("Ans.").  Morningstar moved for summary judgment on November 8, 2023.  *See* Br.  The motion is fully briefed.  *See* Opp.; Dkt. 63 ("Reply").

## III.    Applicable Legal Standard

Under Federal Rule of Civil Procedure ("Rule") 56(a), a moving party is entitled to summary judgment if, on any claim or defense, that party demonstrates from the admissible evidence and pleadings "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A "genuine" dispute over an issue of material fact is one in which "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). The moving party bears the initial burden of demonstrating the absence of a question of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). The non-moving party must advance more than "a scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether there are genuine issues of material fact, a court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Est. of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 675 (2d Cir. 2016) (citation omitted).

In cases involving claims of discrimination or retaliation, "an extra measure of caution is merited" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare." *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 228 (2d Cir. 2024) (citation omitted). However, "the salutary purposes of summary judgment – avoiding protracted, expensive[,] and harassing trials – apply no less to discrimination cases than to other areas of litigation." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation and ellipsis omitted). Even in the context of a discrimination case, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb*, 521 F.3d at 137.

# DISCUSSION

Stinson brings claims of discrimination, retaliation, and hostile work environment under Title VII, the ADEA, the NYSHRL, and the NYCHRL.  Compl. ¶¶ 57-70.  The Court begins with Stinson's federal claims against Morningstar under Title VII and the ADEA.  It then addresses Stinson's state- and city-law claims under the NYSHRL and the NYCHRL.

## I.   Title VII and the ADEA

### A.  Timeliness

Morningstar argues that many of Stinson's federal claims are time barred because they relate to events that occurred over 300 days before the date on which she filed her EEOC charge of discrimination.  Br. at 24-25.  Stinson argues that these acts are actionable under the continuing-violation doctrine.  Opp. at 25-26.

Under Title VII, a prospective plaintiff must file a charge with the EEOC within 180 days or, in states like New York that have local administrative mechanisms for pursuing discrimination claims, 300 days "after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1); *see Banks v. Gen. Motors, LLC*, 81 F.4th 242, 259 (2d Cir. 2023).  "The filing requirement is analogous to a statute of limitations, barring all claims arising outside the 300-day period."  *Kirkland-Hudson v. Mt. Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 444 (S.D.N.Y. 2023) (citation omitted). A 300-day limitation period also applies to Stinson's ADEA claims.  29 U.S.C. § 626(d)(1); *In re IBM Arb. Agreement Litig.*, 76 F.4th 74, 82 (2d Cir. 2023).

"Because a discrete discriminatory act is individually actionable and 'occurs' on the day that it 'happened,' the 300-day limitations period begins running on the day of each occurrence, meaning each discrete act claim carries its own 300-day limitations period."  *King v. Aramark Servs., Inc.*, 96 F.4th 546, 559 (2d Cir. 2024) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002)).  "Claims concerning discrete acts outside this window will be time

barred," *Buon v. Spindler*, 65 F.4th 64, 77 (2d Cir. 2023), but untimely events may be used "as background evidence in support of a timely claim," *Morgan*, 536 U.S. at 113.

The continuing-violation doctrine, however, provides an exception to the 300-day rule. *See Banks*, 81 F.4th at 259. It applies to hostile-work-environment claims, such that "if 'an act contributing to the hostile environment occurs within the filing period,' the hostile work environment claim is timely, and a factfinder can hold a defendant liable for 'the entire time period of the hostile environment,' including the period falling outside of the limitations period." *King*, 96 F.4th at 560 (brackets omitted) (quoting *Morgan*, 536 U.S. at 117). Hostile-work-environment claims "are subject to the continuing violation doctrine because, unlike discrete acts, 'their very nature involves repeated conduct.'" *Olivieri v. Stifel, Nicolaus & Co.*, --- F.4th ----, 2024 WL 3747609, at *11 (2d Cir. Aug. 12, 2024) (brackets omitted) (quoting *Morgan*, 536 U.S. at 115). Whether an act contributes to a hostile work environment turns on whether it is "sufficiently related" to the other alleged conduct. *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77 (2d Cir. 2010).

Stinson filed her charge of discrimination with the EEOC on August 5, 2020. Compl. ¶ 7. Insofar as Stinson claims discrimination and retaliation under Title VII or the ADEA from discrete acts that occurred more than 300 days before that date, that is, before October 10, 2019 – such as the reduction of her annual bonus in February 2018, Opp. at 20 n.2, or Stinson's 2017 PIP – those claims are time barred. *See King*, 96 F.4th at 560 ("[A]n untimely discrete act claim cannot be pulled into the limitations period by a claim premised on a continuing course of conduct, even if the course of conduct includes that discrete act."); *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019) (holding that "discrete discriminatory or retaliatory acts such as termination" are untimely and not actionable "if they occurred prior to the

300-day period even though they may be 'related to' acts that occurred within the permissible

300-day period" (quoting *Morgan*, 536 U.S. at 113)).

　　　For those claims, Stinson's invocation of the continuing-violation is meritless.  *See Tassy v. Buttigieg*, 51 F.4th 521, 532 (2d Cir. 2022) (noting that the doctrine "does *not* apply to discrete acts of discrimination or retaliation that occur outside the statutory time period, even if other related acts of discrimination occurred within the statutory time period" (brackets, quotation marks, and citation omitted; emphasis added)).  Because Stinson's claims for discrimination and retaliation are discrete-act claims, they cannot benefit from the continuing-violation doctrine.  Therefore, the only timely discrete acts alleged by Stinson are the 2020 PIP, issued on February 6, 2020, and her termination on March 5, 2020, with the additional facts to be considered for background purposes.[5]

---

[5] When this motion was filed, the law in this circuit was that "[a] plaintiff sustains an adverse employment action if he or she endures a *materially* adverse change in the terms and conditions of employment."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (emphasis added; citation omitted).  Under this standard, "[a]n adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Id.* (citation omitted).  The issuance of a PIP consequently would not have risen to the level of an adverse action.  *See, e.g.*, *Brown v. Am. Golf Corp.*, 99 F. App'x 341, 343 (2d Cir. 2004) (summary order) (affirming summary judgment on Title VII retaliation claim because PIP did not constitute adverse employment action); *Rivera v. Greater Hudson Valley Health Sys.*, No. 21-cv-01324 (NSR), 2023 WL 2588308, at *12 (S.D.N.Y. Mar. 21, 2023) ("It is well established that being placed on a performance improvement plan does not constitute an adverse employment action." (brackets and citation omitted)).

However, in *Muldrow v. City of St. Louis*, 144 S. Ct. 967, 974 (2024), the Supreme Court held that, to establish the adverse-action prong of a Title VII discrimination claim, a plaintiff only "must show some harm respecting an identifiable term or condition of employment."  The Court clarified that the plaintiff "does not have to show . . . that the harm incurred was significant . . . or serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar."  *Id.*  At least one court in this District has applied this standard to hold that a PIP constitutes an adverse employment action.  *See Anderson v. Amazon.com*, No. 23-cv-08347 (AS), 2024 WL 2801986, at *11 (S.D.N.Y. May 31, 2024) (plaintiff's placement on a PIP was an adverse action because it "adversely affected [her] benefits, privileges, terms, or conditions of employment by saddling her with more and worse

As for Stinson's federal hostile-work-environment claims, the only conduct complained of after October 10, 2019 – and therefore the only alleged discriminatory acts that could "take[] place within the statutory time period," *Morgan*, 536 U.S. at 105 – are Stinson's second PIP and her termination.  These acts are not "sufficiently related" to the other conduct underlying Stinson's hostile-work-environment claims.  *McGullam*, 609 F.3d at 77.  While these acts are relevant to Stinson's discrimination and retaliation claims, she "cannot piggyback [such] discrete adverse acts about which [s]he complains onto hostile work environment claims in order to make them actionable."  *Magadia v. Napolitano*, No. 06-cv-14386 (CM), 2009 WL 510739, at *17 (S.D.N.Y. Feb. 26, 2009).  The only link between the adverse actions in 2020 and the rest of Stinson's allegations of a hostile work environment – dating from 2014 through 2018 – is the fact that Dittmer, one of several decisionmakers behind her 2020 PIP and termination, was purportedly part of the "boys' club" in Horsham.  Yet of all the comments underlying her hostile-work-environment claims, Stinson attributes only one to Dittmer: a request in 2017 that Stinson tell a former co-worker to "fuck off" when she saw her next.  *See* Opp. at 15.  Without more, the Court sees no connection between this comment in mid-2017 and Stinson's PIP and termination in early 2020.  *See McGullam*, 609 F.3d at 78 ("Although [an] incident-free interval does not preclude relatedness, it renders less plausible the notion that" comments that may appear otherwise unrelated are "of a piece" with other offensive conduct); *Villar v. City of New York*, 135 F. Supp. 3d 105, 132 (S.D.N.Y. 2015) (noting that "a twenty-one-month gap, in normal circumstances, would make it less plausible that the conduct is sufficiently related to constitute a continuing violation"); *cf. Ball v. Marriott Int'l, Inc.*, 627 F. Supp. 3d 296, 316

---

tasks, tarnishing her permanent record, dampening her prospects of a promotion or raise, temporarily preventing her from transferring, excluding her from certain meetings and projects, and so on").  The Court likewise considers Stinson's 2020 PIP to be an adverse action.

(S.D.N.Y. 2022) ("The more similar the incidents are in severity, the more likely it is that the incidents are related under *Morgan*." (brackets omitted) (quoting *McGullam*, 609 F.3d at 78 n.5)).  Without a stronger connection between these adverse actions and an ongoing, discriminatory practice that created a hostile work environment, the unrelated adverse actions cannot rescue Stinson's Title VII and ADEA hostile-work-environment claims.  *See Patterson v. County of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004) (affirming summary-judgment dismissal of hostile-work-environment claim as untimely where plaintiff presented "no evidence" that the termination, "even if discriminatory, was in furtherance of the alleged practice of racial harassment").  Therefore, Stinson's federal hostile-work-environment claims consist of no timely acts and are time barred.  Alternatively, even if they were not time barred, these hostile-work-environment claims also fail on their merits as the Court discusses below.  *See infra* Discussion § I(D).

### B.  Discrimination

#### 1.  Title VII

To succeed on a Title VII disparate-treatment claim, Stinson must prove "discrimination either by direct evidence of intent to discriminate" or, more commonly, by "indirectly showing circumstances giving rise to an inference of discrimination." *Banks*, 81 F.4th at 270 (quoting *Vega*, 801 F.3d at 87).  "Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available." *Holcomb*, 521 F.3d at 137; *see Vega*, 801 F.3d at 86 ("[T]he court must be mindful of the 'elusive' nature of intentional discrimination.").  When only circumstantial evidence is available, courts use the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to assess whether the plaintiff has shown sufficient evidence of discrimination to survive summary judgment, *see Banks*, 81 F.4th at 270.  "The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure

that the plaintiff has her day in court *despite the unavailability* of *direct* evidence." *Porter v. Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129, 149 (2d Cir. 2024) (brackets omitted) (quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)).

Under this framework, a plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing that "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Banks*, 81 F.4th at 270 (quoting *Weinstock*, 224 F.3d at 42). The burden at this stage "is not onerous." *Id.* (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)); *see Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019). However, a plaintiff cannot establish a *prima facie* case based on "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985); *accord Villetti v. Guidepoint Glob. LLC*, No. 21-2059, 2022 WL 2525662, at *3 (2d Cir. July 7, 2022) (summary order).

Once the plaintiff has established a *prima facie* case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its adverse action. *Vega*, 801 F.3d at 83 (quoting *McDonnell Douglas*, 411 U.S. at 802); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (clarifying that employer's burden is "one of production, not persuasion" and "involve[s] no credibility assessment" (citation omitted)). Upon that showing, the burden then shifts back to the plaintiff to prove that the employer's stated reason was pretext for discrimination. *Reeves*, 530 U.S. at 143; *Banks*, 81 F.4th at 270-71.

However, "while a plaintiff *may* satisfy the third-stage burden under *McDonnell Douglas* by showing that the employer's stated reason was false and just a pretext, or cover, for a discriminatory intent, a plaintiff is not *required* to demonstrate the falsity of the employer's

proffered reason." *Bart v. Golub Corp.*, 96 F.4th 566, 570 (2d Cir. 2024). "Instead, a Title VII

plaintiff can prevail by proving that an impermissible factor was a *motivating factor*, without

proving that the employer's proffered explanation was not some part of the employer's

motivation." *Id.* (quotation marks and citation omitted); *see Holcomb*, 521 F.3d at 138 (plaintiff

is "not required to show that the employer's proffered reasons were false or played no role in the

employment decision, but only that they were not the only reasons and that a prohibited factor

was at least one of the 'motivating' factors" for the decision (citation omitted)). "A plaintiff may

rely on other evidence that an impermissible criterion was a motivating factor in the employer's

decision to take the adverse action." *Bart*, 96 F.4th at 570.

      a.  Prima Facie *Case*

      Morningstar does not contest that Stinson has satisfied the first or third elements of her

*prima facie* case. It is undisputed that Stinson, as a woman, is a member of a protected class and

that she suffered an adverse employment action through her termination (and her 2020 PIP). *See*

*Bart*, 96 F.4th at 576. Morningstar instead argues that Stinson has failed to show that the

circumstances of her adverse actions give rise to an inference of discrimination. Br. at 11 &

n.7.[6]

      The Court agrees that Stinson has not shown that she was terminated or placed on the

---

[6] In a footnote, Morningstar briefly asserts that Stinson was not qualified for her position but
does not elaborate or provide any analysis on this point. *See* Br. at 11 n.7. Therefore, the Court
declines to consider this argument by Morningstar. *See Revitalizing Auto Cmtys. Env't Response
Tr. v. Nat'l Grid USA*, 10 F.4th 87, 100 n.9 (2d Cir. 2021) ("We ordinarily deem an argument to
be forfeited where it has not been sufficiently argued in the briefs, such as when it is only
addressed in a footnote." (quotation marks and citation omitted)); *In re Lottery.com, Inc. Sec.
Litig.*, --- F. Supp. 3d ----, 2024 WL 454298, at *28 n.8 (S.D.N.Y. Feb. 6, 2024) ("A single,
conclusory, one-sentence argument is insufficient to raise an issue in the first instance." (citation
omitted)). However, the Court notes that Stinson's burden for this element is "minimal" in that
she "must show only that [s]he possesses the basic skills necessary for performance of the job."
*Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001) (further brackets,
quotation marks, and citation omitted); *see Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001)

2020 PIP under circumstances giving rise to an inference of discrimination.  Stinson argues only

that she was treated worse than a male colleague, identified as Employee 1, who was not placed

on a PIP and remains employed at Morningstar.  Opp. at 17-19.  A "showing of disparate

treatment – that is, a showing that an employer treated plaintiff less favorably than a similarly

situated employee outside the plaintiff's protected group – is a recognized method of raising an

inference of discrimination for the purposes of making out a prima facie case."  *King*, 96 F.4th at

563 (brackets omitted) (quoting *Ruiz v. County of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010)).

No reasonable factfinder, however, could conclude that Stinson and Employee 1 were treated

differently while they worked on the same team under Dittmer.  As with Stinson, Dittmer

intended to place Employee 1 on a PIP around March 2020.  Pl. RSOF ¶ 155; *see* Dkt. 43-3 at

53:4-5.  But before Dittmer could place Employee 1 on a PIP, a team in suburban Pennsylvania

requested that he be transferred there to do work that was less analytical and more aligned with

his skillset.  Pl. RSOF ¶ 158; *see* Dkt. 43-3 at 53:6-19.  Once Employee 1 transferred to a

different team in the Philadelphia suburbs and assumed a different role, he no longer shared

enough commonalities with Stinson to serve as an adequate comparator.  *Cf. King*, 96 F.4th at

563 (male peers similarly situated where they had "similar titles to [the plaintiff], had similar

responsibilities, and directly reported to [the same decisionmaker]").  The undisputed facts

confirm that, while Employee 1 worked on Stinson's team, Dittmer intended, but did not get the

chance, to place him on a PIP.  Once he left Dittmer's group, Dittmer could not have placed

Employee 1 on a PIP or fired him.  Therefore, at least as to the differential treatment claimed by

---

("In a discharge case in which the employer has already hired the employee into the job in
question, the inference of minimal qualification is, of course, easier to draw . . . because, by
hiring the employee, the employer itself has already expressed a belief that she is minimally
qualified.").

Stinson, Employee 1 is not a similarly situated employee. *See id.* ("To make this *prima facie* showing, there must be 'a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases.'" (quoting *Ruiz*, 609 F.3d at 494)).[7]

Other facts cut against an inference of discrimination. A different male employee on Dittmer's team, identified as Employee 3, was placed on a PIP and terminated around the same time as Stinson. Pl. RSOF ¶¶ 155, 157; *see Bunten v. Donat*, No. 21-cv-04588 (NSR), 2024 WL 1640054, at *10 (S.D.N.Y. Apr. 16, 2024) (no *prima facie* case where "the record indicates that [the plaintiff] was provided the same, and not differential, treatment as employees outside of her protected class" (emphasis omitted)). Five of the six people involved in the decision to terminate Stinson were women. *See* JSOF ¶ 58; *Bauger v. Spanish Broad. Sys., Inc.*, No. 04-cv-08393 (RJS), 2010 WL 2813632, at *11 (S.D.N.Y. July 12, 2010) ("Courts draw an inference against discrimination where the person taking the adverse action is in the same protected class as the [a]ffected employee."), *aff'd*, 423 F. App'x 102 (2d Cir. 2011) (summary order). So were most of the people involved in placing Stinson on the 2020 PIP: Stafford, Lee, and Mullins. *See* Pl. RSOF ¶¶ 121, 134. Even viewing all facts in the light most favorable to Stinson, a rational factfinder could not infer that Stinson's termination or PIP was based on her sex.

> b. *Legitimate, Nondiscriminatory Reasons*

Because Stinson has failed to make out a *prima facie* case of sex discrimination, summary judgment is properly granted for Morningstar as to Stinson's Title VII discrimination claim. But even if Stinson had established her *prima facie* case, Morningstar has articulated legitimate, nondiscriminatory reasons for placing Stinson on a PIP and terminating her: poor

---

[7] Stinson does not cite other evidence in support of her *prima facie* sex-discrimination argument. *See* Opp. at 17-19. Even if she had cited the various comments allegedly made by Morningstar employees between 2014 and 2018, those comments would not support an inference of discrimination. *See infra* Discussion § I(D).

performance and insubordination.  Br. at 16-17.  Morningstar has submitted ample justification

for its reasons, including lackluster Manager Alignment Surveys from 2017 through 2019, the

most recent of which noted that Stinson had "produced the bare minimum" for her role, lacked

the ability to multitask, and had "openly been hostile with her manager," Pl. RSOF ¶¶ 40, 83,

125-26; her ratings as an "inconsistent performer" in 2018 and 2019, *id.* ¶ 124; a report from

Stinson's manager in September 2018 that she performed below expectations and was passive

aggressive with her colleagues, *id.* ¶ 71; concerns expressed to Mullins in 2019 about Stinson's

performance and unprofessional behavior, *id.* ¶¶ 84, 87, 114-115, 122; at least three emails from

late 2019 and early 2020 that Stinson's managers deemed insubordinate, *id.* ¶¶ 108-110, 127-

129; a second PIP, issued in February 2020, that included examples of Stinson's substandard

performance and abrasive communications, *id.* ¶ 140; and, after the 2020 PIP, further instances

of mistakes and missed deadlines, *id.* ¶¶ 146-149.[8]

Morningstar has more than adequately established a documented, justifiable basis for its

adverse actions.  *See, e.g.*, *Xu v. City of New York*, No. 21-1059, 2023 WL 4285031 (2d Cir. June

30, 2023) (summary order) (plaintiff's "unwillingness to learn from and cooperate with her

coworkers" and inability "to complete her assignments" are legitimate, nondiscriminatory

reasons for termination); *Borzon v. Green*, 778 F. App'x 16, 18 (2d Cir. 2019) (summary order)

(same for plaintiff's "multiple negative performance evaluations" and difficulties in "interacting

with some of his colleagues"); *Nolley v. Swiss Reinsurance Am. Corp.*, 857 F. Supp. 2d 441, 460

---

[8] Stinson challenges as inadmissible hearsay many of the concerns raised to Mullins and Dittmer about Stinson's poor performance.  *See* Pl. RSOF ¶¶ 84, 87, 115.  But Morningstar does not offer these out-of-court statements for the truth of the matter asserted, namely that Stinson was actually a poor performer.  Rather, Morningstar presents these statements to show that, at the time of Stinson's termination, it had at least a good-faith belief that Stinson was a poor performer.  Therefore, the challenged statements are admissible for that purpose, and the Court considers them accordingly.

(S.D.N.Y. 2012) (evidence of legitimate, nondiscriminatory reason for termination where plaintiff was issued a PIP that "explicitly listed [his] confrontational interactions . . . as a serious performance deficiency" and "put [him] on notice that a failure to improve . . . could result in termination"), *aff'd*, 523 F. App'x 53 (2d Cir. 2013) (summary order); *Campbell v. Cellco P'ship*, 860 F. Supp. 2d 284, 289-90, 302 (S.D.N.Y. 2012) (employer "provided legitimate business justifications for its decisions" where a supervisor emailed HR "seeking to demote plaintiff" and plaintiff was placed on a PIP, received low rankings on performance reviews, and was issued a "Final Written Warning" before termination).

          c.   *Pretext*

Stinson suggests that Morningstar's reasons for terminating her were pretext for discrimination, but she fails to present sufficient evidence to mount a credible rebuttal.  *See* Opp. at 20-21.

Stinson first dismisses as a "red herring" any critique of her performance predating Dittmer's promotion in August 2019, noting that Morningstar removed her first PIP and did not impose any further discipline.  *Id.* at 19-20.  Stinson mischaracterizes this evidence.  While the criticism in Stinson's first PIP was not conclusive enough to terminate her, Morningstar noted that Stinson's continued employment did not prove a *lack* of performance issues.  *See* Pl. RSOF ¶ 61; JSOF ¶ 22.  The problems highlighted in Stinson's work from 2016 to 2018 did not disappear, and they were part of the record before Morningstar when it placed Stinson on a 2020 PIP and later terminated her.  Moreover, even if the issues in Stinson's first PIP had no merit, satisfactory performance in earlier years would not negate her performance issues later. *See Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 577 (S.D.N.Y. 2010) ("Even if credited, plaintiff's claim of prior favorable performance does not, without more, prove his subsequent poor reviews were unwarranted."); *Missick v. City of New York*, 707 F. Supp. 2d 336,

350 (E.D.N.Y. 2010) ("The mere fact of past satisfactory performance, followed by negative feedback, is not suggestive of impermissible animus.").

Stinson also notes that Dittmer told his colleagues that he was "making a file on Celeste" within weeks of becoming her manager, when he could not have been familiar with Stinson's performance. Opp. at 20. Yet Stinson's poor performance was well documented by this point in September 2019. In light of this record, the fact that Dittmer asked his colleagues to submit performance information on Stinson does not suggest that he was creating a sham case against her. *Cf. Jean-Pierre v. Citizen Watch Co. of Am., Inc.*, No. 18-cv-00507 (VEC), 2019 WL 5887479, at *11 (S.D.N.Y. Nov. 12, 2019) (supervisor's file of notes on plaintiff did not establish an inference of discrimination). Nor has Stinson offered any evidence that any performance issues compiled through Dittmer's outreach were *themselves* without merit or that Dittmer collected notes on Stinson because of her sex. Without more, Dittmer's comment does not amount to "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Forte v. Liquidnet Holdings, Inc.*, 675 F. App'x 21, 25-26 (2d Cir. 2017) (summary order) (brackets and citation omitted).

Finally, Stinson claims pretext because she was reprimanded in part for her unprofessional behavior while her "colleagues and managers regularly used foul, unprofessional language without any negative consequences." Opp. at 21. She notes, for example, that the sarcasm in her November 7, 2019 email to Dittmer "was far less sarcastic than much of the language used on a regular basis by her (mostly male) colleagues." *Id.* However, Stinson was disciplined for insubordination, not vulgar word choice or colorful language. *See* 2020 PIP at 4-6 (citing three emails from Stinson). That Morningstar employees may have used crude or crass

language at times does not mean that the company tolerated its employees talking back to their managers or undermining their decisions.

Absent unconvincing reasons for why Morningstar's reasons were pretextual, Stinson does not otherwise present evidence that her sex "was a motivating factor" in Morningstar's decision to terminate her. *Bart*, 96 F.4th at 570. Therefore, she has not shown that her termination was due to discriminatory animus as opposed to Morningstar's asserted reasons. The Court grants summary judgment for Morningstar on Stinson's Title VII discrimination claim, both because Stinson has failed to show circumstances giving rise to an inference of discrimination and because she has presented insufficient evidence of pretext.

### 2. ADEA

Stinson's ADEA claim of age discrimination is weaker than her Title VII claim and fails for similar reasons. The ADEA makes it "unlawful for an employer . . . to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a). As with Title VII claims, ADEA claims are analyzed under the *McDonnell Douglas* framework. *See Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 302 n.3 (2d Cir. 2021). However, "[t]o prevail on an ADEA age discrimination claim, it is not sufficient for a plaintiff to show 'that age was simply a motivating factor' in the employer's adverse action." *Id.* at 302-03 (quoting *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 174 (2009)). A plaintiff "must prove that the employer's proffered reason was a pretext for discrimination . . . by presenting facts, which taken in [her] favor, suffice to show that a triable issue exists as to whether [her] age was a but for cause of" the adverse employment action. *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168 (2d Cir. 2014) (per curiam) (further brackets, quotation marks, and citation omitted).

Stinson's ADEA discrimination claim fails because she presents no admissible evidence to the Court raising even a minimal inference that her 2020 PIP or termination was motivated by

age.  Stinson argues that Morningstar had a pattern of discriminating against older (mostly female) employees.  Opp. at 21-22.  However, the only evidence cited for such a pattern comes from Mullins's notes on her December 14, 2017 meeting with Stinson and other colleagues, during which one colleague, Fan Huang, said she felt like "something is going on" and that "her meetings are led with knifes and bullets."  *See id.*; Dkt. 58-9 at 2.  Another colleague, Charles Calhoun, said he felt that Stinson, among others, was treated unfairly as a woman and that he was "treated differently because he is older."  Dkt. 58-9 at 2-3.  These out-of-court statements are hearsay.  Materials submitted in support of or in opposition to a motion for summary judgment "must be admissible themselves or must contain evidence that will be presented in admissible form at trial."  *Delaney*, 766 F.3d at 170; *accord* Fed. R. Civ. P. 56(c), (e).[9]

Stinson cannot impute Huang's and Calhoun's statements to Morningstar under Federal Rule of Evidence 801(d)(2)(D), which provides an exclusion from the rule against hearsay for statements "offered against an opposing party [that] . . . w[ere] made by the party's agent or employee on a matter within the scope of that relationship and while it existed."  Fed. R. Evid. 801(d)(2)(D).  Under that rule, "an employee's statement is not hearsay when used against an employer, where the record shows '(1) the existence of an agency relationship between the declarant and the employer, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency.'"  *Cameron v. N.Y.C. Dep't of Educ.*, No. 15-cv-09900 (KMW), 2018 WL 1027710, at *4 (S.D.N.Y. Feb. 21,

---

[9] Elsewhere, Stinson claims she heard Overby dismiss a job candidate as "way too old," JSOF ¶ 20, and that Overby had excluded her and another older colleague from a team dinner, *see* Df. RSOF ¶ 285; Dkt. 58-22.  Even if Stinson had relied on these comments for her ADEA discrimination claim, they would not affect the Court's analysis.  Overby left Morningstar in June 2018; she had no role in Stinson's 2020 PIP or termination nearly two years later.  Pl. RSOF ¶ 66.

2018) (brackets omitted) (quoting *United States v. Rioux*, 97 F.3d 648, 660 (2d Cir. 1996)).  "[A] declarant 'need only be an advisor or other significant participant in the decision-making process that is the subject matter of the statement' for the statement 'to be deemed within the scope of his agency.'"  *Weaver v. Bloomberg L.P.*, --- F. Supp. 3d ----, 2024 WL 693166, at *11 (S.D.N.Y. Feb. 20, 2024) (quoting *Rioux*, 97 F.3d at 661).

Here, however, the statements were from co-workers who were not Stinson's supervisor and who played no significant role in the employment decisions at issue.  As a result, Huang's and Calhoun's statements concern a matter outside the scope of their employment relationship. *See Smith v. N.Y. & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 339 (S.D.N.Y. 2020) (co-worker's statement that supervisors were trying to get plaintiff fired and "don't like women like us" was "inadmissible hearsay" because, among other reasons, co-worker was "not [the plaintiff's] supervisor and ha[d] no significant role in the employment decisions at issue"); *Evans v. Port Auth. of N.Y. & N.J.*, 192 F. Supp. 2d 247, 262-64 (S.D.N.Y. 2002) (co-worker's statement could not be imputed to employer, and thus was inadmissible, where there was no evidence that co-worker was plaintiff's supervisor, that he played a role in any relevant employment decision, or that the statement related to his duties); *Di Giovanna v. Beth Isr. Med. Ctr.*, 651 F. Supp. 2d 193, 202-03 (S.D.N.Y. 2009) (co-worker's statement could not be imputed to employer where there was no evidence she "had anything to do with" the employment decision affecting plaintiff).

Even if these statements were admissible, Huang did not state that the hostility she felt was because of her age; she felt the "hostile work environment" was aimed at those working in Morningstar's NYC office.  Dkt. 58-9 at 2 ("She feels like NYC is being singled out.").  Calhoun similarly attributed Stinson's unfair treatment to her gender, not to her age.  *Id.* at 3.  Stinson also cites a comment by her former manager that "the culture is toxic," but, in context, that comment

referred only to possible gender bias and did not mention age discrimination.  Opp. at 22 (citing

Dkt. 58-36 at 3).  Without admissible (or probative) evidence, Stinson cannot create an inference

of age discrimination from her otherwise conclusory assertion that Morningstar had a pattern of

targeting older workers.

Other facts weaken any inference of age discrimination.  As Morningstar points out,

Stinson was 56 years old when it hired her, and where "an employee is already a member of

the protected class when hired, any inference of age discrimination when her employment is

terminated is undermined."  *Snowden v. Trs. of Columbia Univ.*, No. 12-cv-03095 (GBD), 2014

WL 1274514, at *8 (S.D.N.Y. Mar. 26, 2014), *aff'd*, 612 F. App'x 7 (2d Cir. 2015) (summary

order).  Five out of the six people who decided to terminate Stinson – including Dittmer – were

over the age of 40 and members of the same protected age class.  *See* Pl. RSOF ¶ 154; *Testa v.

CareFusion*, 305 F. Supp. 3d 423, 437 (E.D.N.Y. 2018) (noting, in granting summary judgment

to the defendant on an ADEA age-discrimination claim, that "those individuals responsible for

terminating [the] plaintiff's employment were also members of the protected class"); *Robles v.

Cox & Co.*, 987 F. Supp. 2d 199, 208 (E.D.N.Y. 2013) (noting for similar reasons that chief

financial officer who participated in the decision to terminate the plaintiff was 54 years old at the

time).  So too for many of the employees involved in Stinson's 2020 PIP.  *See* Pl. RSOF ¶ 154.

Employee 3, who was terminated around the same time as Stinson, was 30 years old.  Pl. RSOF

¶¶ 157, 160; *see Chin v. ABN-AMRO N. Am., Inc.*, 463 F. Supp. 2d 294, 303 (E.D.N.Y. 2006)

("[T]he fact that younger employees were dismissed along with the plaintiff refutes rather than

supports his claim of age discrimination." (quotation marks and citation omitted)).  Employee 2,

who was placed on a PIP around this time, was 44.  Pl. RSOF ¶¶ 156, 159.

Stinson's ADEA discrimination claim also fails because, in the absence of any

discriminatory motivation for her 2020 PIP or termination, Morningstar presents Stinson's poor

performance and insubordination as compelling, nondiscriminatory reasons for its adverse

actions.  Aside from the pretext arguments raised in the context of her Title VII discrimination

claim, Stinson presents no other evidence to suggest that age was a but-for cause of any adverse

actions.

In sum, Stinson has failed to produce any evidence demonstrating that age discrimination

had anything to do with her 2020 PIP or termination, let alone that age discrimination was a but-

for cause.  No reasonable factfinder could find otherwise, and the Court grants summary

judgment to Morningstar on this claim.

### C. Retaliation[10]

The Court turns next to Stinson's federal retaliation claims.  Retaliation claims under

Title VII and the ADEA are also analyzed under the *McDonnell Douglas* framework.  *See Carr*

*v. N.Y.C. Transit Auth.*, 76 F.4th 172, 178 (2d Cir. 2023).  "To present a prima facie case of

retaliation under [Title VII or the ADEA], a plaintiff must show that (1) she participated in an

activity protected by Title VII [or the ADEA], (2) this participation was known to her employer,

(3) the employer subjected her to a materially adverse action thereafter, and (4) a causal

connection existed between the protected activity and the adverse action."  *Moll*, 94 F.4th at 239

(quotation marks and citation omitted); *accord Gordon-Mallett v. Mt. Sinai Hosps. Grp., Inc.*,

No. 22-cv-01159 (LJL), 2024 WL 1513910, at *18 (S.D.N.Y. Apr. 8, 2024).  "The element of

causation requires a plaintiff to demonstrate 'that the retaliation was a but-for cause of the

employer's adverse action.'"  *Gordon-Mallett*, 2024 WL 1513910, at *18 (citation omitted); *see*

---

[10] As to her retaliation claims, Stinson alleges only that her termination was retaliation for her complaints of discrimination.  *See* Compl. ¶¶ 60, 64, 70.  She does not allege that her 2017 or 2020 PIPs were retaliatory.  Therefore, the Court considers Stinson's retaliation claims only in the context of her termination.

*Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013) (plaintiff must prove that the "adverse action would not have occurred [but for] the retaliatory motive").

"Once the plaintiff has established a prima facie showing of retaliation, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the [adverse] employment action." *Zann Kwan*, 737 F.3d at 845. "If the defendant carries this burden, the plaintiff must then present evidence demonstrating that retaliation was a 'but-for' cause of the adverse action." *Giurca v. Bon Secours Charity Health Sys.*, No. 23-200, 2024 WL 763388, at *2 (2d Cir. Feb. 26, 2024) (summary order) (quoting *Zann Kwan*, 737 F.3d at 845). The plaintiff can do so by showing that "the 'legitimate, non-retaliatory reason' offered by the employer is mere pretext, and that the employer's 'desire to retaliate' was the real 'but-for cause of the challenged employment action.'" *Russell v. N.Y. Univ.*, 739 F. App'x 28, 32 (2d Cir. 2018) (summary order) (quoting *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70, 73 (2d Cir. 2015)).

1. *Prima Facie* Case

Morningstar does not contest that Stinson has satisfied the first and third elements of her *prima facie* case. *See Cooper v. N.Y. State Dep't of Lab.*, 819 F.3d 678, 680-81 (2d Cir. 2016) (per curiam) ("A plaintiff seeking to demonstrate that [s]he engaged in protected activity need not show that the behavior [s]he opposed in fact violated Title VII; [s]he must, however, show that [s]he possessed a good faith, reasonable belief that the employer's conduct qualified as an unlawful employment practice under the statute." (quotation marks and citations omitted)); *Sharikov v. Philips Med. Sys. MR, Inc.*, 103 F.4th 159, 170 (2d Cir. 2024) (same for ADA). Instead, it argues that she has failed to demonstrate that Dittmer knew of Stinson's protected activity, or that there was a causal connection between her protected activity and her termination. Br. at 21-23. The Court agrees as to the latter element.

      a.   *Employer's Knowledge of Protected Activity*

The parties dispute whether, at the time of Stinson's termination, Dittmer knew that Stinson had ever complained of age or sex discrimination.  Pl. RSOF ¶ 170.  According to Stinson, it was well known that she had at least complained about Dittmer in August 2019 before he was appointed head of the New York CMBS office.  *Id.* ¶¶ 170-171.  Morningstar insists that Dittmer had no knowledge of Stinson's complaints.  Br. at 21; Reply at 8.

The evidence in the record creates a genuine issue of material fact as to Dittmer's knowledge of Stinson's complaints.  Shortly before Dittmer became head of the CMBS team in New York, she expressed her concerns about Dittmer to Stafford, who responded that she had already spoken to Dittmer about his past behavior.  *See* Df. RSOF ¶¶ 326, 330.  Gordon Sinclair also testifies in his declaration that "[i]t was no secret at Morningstar that, prior to Mr. Dittmer's appointment to this new role, Ms. Stinson had complained about Mr. Dittmer.  It was widely known at Morningstar that there was a negative history involving Mr. Dittmer and Ms. Stinson." Dkt. 57 ¶ 5.  According to Sinclair, "it was common knowledge in the office that Ms. Stinson had complained about Mr. Dittmer." *Id.* ¶ 6.  Even if Stinson's exchange with Stafford is inadmissible hearsay (as Morningstar argues), Br. at 21, Sinclair's declaration is not.  A reasonable jury could conclude from Sinclair's testimony and the other evidence in the record that Dittmer knew that Stinson had complained about him and his behavior.

      b.   *Causal Connection*

A reasonable jury could not, however, find a but-for causal connection between Stinson's complaints and her termination.  Causation "can be established either (1) 'directly, through evidence of retaliatory animus' toward the plaintiff, or (2) 'indirectly,' through 'circumstantial evidence.'" *Moll*, 94 F.4th at 239 (quoting *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010)). Stinson offers no direct evidence that she was fired in retaliation for complaining of past

discrimination.  Instead, she points to the temporal proximity between her complaints and the termination, and Dittmer's comment that he was "mak[ing] a file on Celeste."  *See* Opp. at 24; *Moll*, 94 F.4th at 239 (causal connection can be proved indirectly through "close temporal proximity" between the protected activity and an adverse action (brackets and citation omitted)). Although the Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Gorman-Bakos v. Cornell Co-op. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001), the Supreme Court has suggested that the temporal proximity "must be very close," *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (quotation marks and citation omitted); *see Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (a court may "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases").

Stinson presents four possible instances of protected activity: her August 2017 complaint to Hogue of nitpicking; her January 2018 complaint; her August 2018 complaint to Morningstar's president; and her discussion in August or September 2019 when she expressed concerns about Dittmer to Stafford and Pollem.  *See* Opp. at 23 & n.5; Df. RSOF ¶¶ 230, 326. For the first three complaints, the latest of which occurred in August 2018, Stinson cannot demonstrate a causal connection to her termination on March 5, 2020.  The temporal gap of at least 18 months suggests "no causality at all."  *Breeden*, 532 U.S. at 274 (no causality for adverse action 20 months after protected activity); *see Baldwin v. Goddard Riverside Cmty. Ctr.*, 53 F. Supp. 3d 655, 675 (S.D.N.Y. 2014) (15-month gap between termination and complaint of discrimination "is too wide to support the inference that [the plaintiff] was terminated in

retaliation for complaining about discrimination" (citation omitted)), *aff'd*, 615 F. App'x 704 (2d Cir. 2015) (summary order).

Even Stinson's latest complaint, made was as recently as September 2019, occurred over five months before her termination. This temporal gap, without more, is still too long to amount to indirect evidence of but-for causation. *See Farooq v. City of New York*, No. 20-3185, 2022 WL 793117, at *5 (2d Cir. Mar. 16, 2022) (summary order) (deeming "five-month temporal gap," without more, "insufficient to plead causation"); *Kraiem v. JonesTrading Institutional Servs. LLC*, 571 F. Supp. 3d 53, 60 (S.D.N.Y. 2021) (noting that "most courts in the Second Circuit have held that a lapse of time beyond two or three months will break the causal inference"); *Smith*, 440 F. Supp. 3d at 343 (collecting cases holding that a three-month gap is "insufficient to yield an inference of causal connection"); *Yagudaev v. Credit Agricole Am. Servs., Inc.*, No. 18-cv-00513 (PAE), 2020 WL 583929, at *12-13 (S.D.N.Y. Feb. 5, 2020) (collecting cases for proposition that, without more, statements made "a few months" before an adverse action are nonprobative). Stinson argues that Dittmer retaliated against her "at the first available opportunity." Opp. at 24 (citing *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013)). Yet Dittmer's first opportunity to retaliate would have been in August or September 2019, when he became Stinson's manager. That Stinson's adverse actions came months later undermines any inference of retaliation.[11]

---

[11] In *Summa*, the Second Circuit held that a seven-month gap between the protected activity and the adverse action was "not prohibitively remote" for an inference of causation where the decisionmaker had personal knowledge of protected activity when she terminated plaintiff's employment and had made a comment suggesting a retaliatory motive. 708 F.3d at 128. There, the decisionmaker told her colleague to screen employees like the plaintiff for litigation-related conflicts, which, in context, plainly related to a complaint that the plaintiff had filed with the New York State Division of Human Rights. *Id.* at 122. There are no such comments here. For the reasons set forth above, Dittmer's "making a file" comment does not suggest a retaliatory motive.

Even if there were a sufficient temporal connection, the road leading to Stinson's termination began long before she complained to Stafford and Pollem about Dittmer in August or September 2019. The parties "have submitted an extensive record of negative reviews and feedback that predate and postdate" Stinson's August 2019 complaint. *Woolf v. Bloomberg L.P.*, No. 16-cv-06953 (PKC), 2019 WL 1046656, at *14 (S.D.N.Y. Mar. 5, 2019), *aff'd*, 792 F. App'x 143 (2d Cir. 2020) (summary order). Stinson received negative feedback in her year-end review for 2016, including comments that she had "some problems meeting deadlines" and "[n]eeds to communicate better with managers." Pl. RSOF ¶¶ 19-20. In March 2017, Stinson's manager told her that she sometimes did not meet her deadlines. *Id.* ¶ 21. In July 2017, she received an email with more "critical feedback," including a warning that Stinson was "not meeting . . . expectations for a senior analyst." *Id.* ¶¶ 22-23, 25. In December 2017, Stinson was placed on her first PIP, which noted several areas of deficient performance. *Id.* ¶ 35. While Morningstar found the PIP inconclusive to terminate Stinson then, it indicated that she still had performance issues. *See id.* ¶ 61. For every question on her 2017 and 2018 Manager Alignment Surveys, Stinson was rated a 2 out of 4 or a 1 out of 5 by her manager. *Id.* ¶¶ 40, 83. As of January 2018, Stinson's overall employee rating was a "1," meaning that she "inconsistently meets expectations and sometimes delivers results below expectations." *Id.* ¶ 41. In September 2018, Stinson's then-manager reported that Stinson was performing below expectations and noted her passive-aggressive tone. *Id.* ¶¶ 70-71. Stinson was rated an inconsistent performer for both 2018 and 2019. *Id.* ¶ 124.

In short, reviews of Stinson's work ranged from middling to negative from 2016 through her termination in 2020. Based on this documented record of problems that managers perceived with Stinson's performance, beginning well before Stinson first complained of discrimination, no

reasonable factfinder could infer a causal connection between Stinson's 2019 complaint and her 2020 PIP or termination. *Mattera*, 740 F. Supp. 2d at 582 (no causal connection where "plaintiff's documented poor performance began significantly and sufficiently earlier" than his complaints and subsequent firing); *Dixon v. Int'l Fed'n of Accts.*, No. 09-cv-02839 (HB), 2010 WL 1424007, at *6 (S.D.N.Y. Apr. 9, 2010) (dismissing retaliation claim on summary judgment despite "some temporal proximity" where plaintiff "was subjected to repeated critiques and complaints about her management and performance skills before she ever lodged any complaints about discrimination"), *aff'd*, 416 F. App'x 107 (2d Cir. 2011) (summary order).

　　　　2. Pretext

　　　　Even if Stinson were able to establish a *prima facie* case of retaliation, the same legitimate and nondiscriminatory reasons offered in the discrimination context for Morningstar's adverse actions apply to the retaliation claims. Here, too, Stinson points to Dittmer's comment that he was "making a file on Celeste" as evidence of pretext. Opp. at 24-25. But even before Stinson's 2019 complaint, Morningstar had identified deficiencies in Stinson's performance and were taking steps to improve that performance. Mullins met regularly with Stinson's managers to coach them on how to provide effective feedback to Stinson in light of her performance deficiencies. Pl. RSOF ¶ 85; *see* Dkt. 43-2 at 66:8-68:24 (noting that these meetings started in late 2018). Because Morningstar was "beginning to critique and discipline" Stinson "long before" her complaint, "the continuation of this progressive discipline process demonstrates that it was not undertaken because of any protected activity by [the plaintiff] that occurred later." *Pasquarello v. Crothall Healthcare, Inc.*, No. 21-cv-08732 (JLR), 2023 WL 5714165, at *11 (S.D.N.Y. Sept. 5, 2023). In any event, Dittmer's statement about documenting performance, without more, does not overcome the consistent and well-documented criticisms of Stinson's performance. *See Ya-Chen Chen*, 805 F.3d at 77 (rejecting NYCHRL retaliation claim where

36

decisionmaker noted negative feedback of, and formed a negative opinion on, plaintiff's performance and collegiality "long before" her complaint); *Hill v. N.Y.C. Hous. Auth.*, 220 F. Supp. 3d 499, 508 (S.D.N.Y. 2016) (plaintiff's termination was "divorced from any retaliatory motive" where plaintiff's poor work performance was "clearly well-documented" and predated her protected activity); *Yeger v. Inst. of Culinary Educ., Inc.*, No. 14-cv-08202 (LTS), 2017 WL 377936, at *16 (S.D.N.Y. Jan. 25, 2017) (no evidence of pretext as to retaliation claims where the plaintiff's termination was "part of a sustained progression of performance critiques and discussions . . . all of which began many months (and even several years) prior to Plaintiff's letters [asserting claims] being sent").

The single case cited by Stinson does not upset the Court's conclusion. *See* Opp. at 25 (citing *Steele-Hegg v. Comput. Assocs. Int'l*, No. 03-cv-05939 (DLI), 2007 WL 1989434 (E.D.N.Y. July 9, 2007)). In *Steele-Hegg*, the court found evidence of pretext from the fact that the plaintiff's supervisor noted in her file that she had failed to meet the sales goals in her PIP two days *before* the time for her to do so had run. 2007 WL 1989434, at *4, *11. Drawing all inferences in favor of Stinson, Dittmer's comment suggests at most that he wished to collect information from Celeste's managers to see if an adverse action was justified. It does not suggest that Dittmer created a false or inaccurate record of Stinson's performance. Stinson does not present any evidence that the issues raised and collected as part of Dittmer's "file" on Stinson were without merit. Therefore, Stinson has not "demonstrate[ed] weaknesses, implausibilities, inconsistencies, or contradictions" in Morningstar's proffered reasons for its termination. *Zann Kwan*, 737 F.3d at 846.

Morningstar's evidence establishes that Stinson was terminated because of complaints that she was not adequately or timely completing her duties and that it was challenging to work

with her.  To rebut this showing, Stinson offers only a neutral "making a file" comment by Dittmer.  From this record, no factfinder could reasonably find by a preponderance of the evidence that Stinson's complaints were a but-for cause of Morningstar's adverse actions.  The Court therefore grants summary judgment for Morningstar on Stinson's retaliation claims.

### D.  Hostile Work Environment

Although Stinson's hostile-work-environment claims are time barred, *see supra* Discussion § I(A), the Court will alternatively consider "the entire scope of" these claims on the merits, "including behavior alleged outside the statutory time period," *Davis-Garett*, 921 F.3d at 42.

To prevail on a hostile-work-environment claim under Title VII or the ADEA, a plaintiff must establish "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019) (brackets, quotation marks, and citation omitted). Importantly, "[a] plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class." *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999)).  Even considering all events before October 10, 2019, Stinson fails to show that any age- or sex-related harassment "was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment." *Fox*, 918 F.3d at 74 (brackets and citation omitted).  Thus, the Court need not decide whether Stinson has shown "that a specific basis exists for imputing the objectionable conduct to" Morningstar. *Id.* (citation omitted).

"To establish a hostile work environment . . . , a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

environment.'" *Littlejohn v. City of New York*, 795 F.3d 297, 320-21 (2d Cir. 2015) (quoting

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  "Although the victim must *subjectively*

perceive the conduct as abusive, the misconduct shown also must be severe or pervasive enough

to create an *objectively* hostile or abusive work environment."  *Fox*, 918 F.3d at 74 (quotation

marks and citation omitted; emphases added).  "Courts look to the totality of the circumstances

to determine whether a plaintiff has met this burden, including proof of the frequency of the

discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a

mere offensive utterance; and whether it unreasonably interfered with the plaintiff's work

performance."  *Id.* (brackets and quotation marks omitted).  Usually, "[t]he incidents complained

of must be more than episodic; they must be sufficiently continuous and concerted in order to be

deemed pervasive."  *Littlejohn*, 795 F.3d at 321.

    As the basis for her hostile-work-environment claims, Stinson cites comments from 2014

to November 2018, including: a rumor that Sheila Bjornstad was a lesbian; comments that

Bjornstad "doesn't wear dresses because her balls might show" and that she had "bigger balls"

than a male co-worker; a comment in 2014 or 2015 that "women keep the kitchen clean"; a

comment in 2015 or 2016 that Stinson was allowed to lead a particular deal only "because

they're impossible to fuck up"; a question about Stinson's opinion on underwriting mobile home

parks, made in reference to Stinson's Tennessee roots and Southern accent; a 2017 comment that

"old dogs can learn new tricks" after Stinson showed an Excel function at a meeting; a request

that Stinson tell Bjornstad to "fuck off" when she saw her next; a response by Stinson's then-

supervisor in 2017 that Stinson's role was to "underwrite the piece of shit deals in the middle of

nowhere that no one else wants to touch"; Overby's comment to Trainer in mid-2017 that "I

know she's a problem, so document[,] document[,] document"; Overby's email in December

2017 that "we would like to see [Stinson] gone shortly after the end of the one-month PIP"; and, a statement in November 2018 that Stinson was working from home because she's "too old to get out of bed in the morning."  Opp. at 15-16 (further brackets omitted).

Most of the alleged comments have nothing to do with age or gender, such as the comment that a particular deal was "impossible to fuck up," comments about underwriting mobile homes, the directive to tell Bjornstad to "fuck off," the "piece of shit deals" comment, the advice to "document, document, document," and Overby's email that she wanted to see Stinson "gone."  The context of these statements provides no basis for a factfinder to conclude that Stinson's mistreatment was because of her membership in a protected class; these remarks are therefore insufficient to support her hostile-work-environment claims.  While "[b]ullying and harassment have no place in the workplace, . . . unless they are motivated by the victim's membership in a protected class, they do not provide the basis for an action under" federal anti-discrimination laws.  *Johnson v. City Univ. of N.Y.*, 48 F. Supp. 3d 572, 574 (S.D.N.Y. 2014); *see Sherman v. Yonkers Pub. Schs.*, No. 21-cv-07317 (CS), 2023 WL 137775, at *11 (S.D.N.Y. Jan. 9, 2023) ("Allegations of unfair treatment directed at a member of a protected class do not establish a claim absent a basis to conclude that unfair treatment arose because of the victim's membership in that class."); *Russo v. N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d 429, 453 (E.D.N.Y. 2013) (granting summary judgment on NYCHRL hostile work environment claim because the defendant's inappropriate comments and actions, while difficult to deal with, did not raise a genuine issue of fact as to whether the plaintiff was discriminated against because of her gender).

Even if the Court were to consider these facially neutral remarks – together with the few that refer to age and gender – in assessing Stinson's federal hostile-work-environment claims, it

would conclude only that the assortment of comments, made over a five-year period, "may have created a tense and unpleasant atmosphere in which to work, but nonetheless was not severe or pervasive enough to be actionable." *Barney v. H.E.L.P. Serv. Corp.*, No. 19-cv-05959 (KPF), 2021 WL 4267629, at *14 (S.D.N.Y. Sept. 20, 2021) (quotation marks and citation omitted). While many of these comments reveal the use of crass language at Morningstar, the Court must "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quotation marks and citation omitted). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (quotation marks and citation omitted).

Courts routinely hold that stray incidents of the nature alleged in this case (and, indeed, of a more serious nature) fail to support a hostile-work-environment claim under federal civil-rights statutes. *See, e.g.*, *Harvin v. Manhattan & Bronx Surface Transit Operating Auth.*, 767 F. App'x 123, 128 (2d Cir. 2019) (summary order) (deeming insufficient allegations that supervisors were rude and hostile on various occasions, including two occasions where they may have referred to plaintiff's disability); *Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*, No. 05-cv-05109 (JCF), 2007 WL 1149979, at *17 (S.D.N.Y. Apr. 18, 2007) (acknowledging that supervisor's "use of derogatory language to refer to patients and staff [was] plainly inappropriate," but holding that, "as a matter of law, a supervisor's occasional use of sexist language does not create a hostile work environment"), *aff'd*, 303 F. App'x 943 (2d Cir. 2008) (summary order); *Augustin v. Yale Club of N.Y.C.*, No. 03-cv-01924 (KMK), 2006 WL 2690289, at *21-22 (S.D.N.Y. Sept. 15, 2006) (co-workers' use of phrases including "fucking negrita" and

41

"black bitch" to refer to plaintiff not sufficient to create hostile work environment), *aff'd*, 274 F.

App'x 76 (2d Cir. 2008); *Garone v. United Parcel Serv., Inc.,* 436 F. Supp. 2d 448, 469

(E.D.N.Y. 2006) (supervisor's use of phrases "office bitch," "brooklyn bimbettes," and "cat

fight" not sufficient to create hostile work environment (quotation marks omitted)), *aff'd*, 254 F.

App'x 108 (2d Cir. 2007) (summary order).  So too here.  Therefore, the Court grants summary

judgment to Morningstar on Stinson's Title VII and ADEA claims for a hostile work

environment.

## II.    NYSHRL and the NYCHRL[12]

Having addressed Stinson's federal-law claims, the Court turns to Stinson's state-law

claims.  "[C]ourts must analyze NYCHRL claims separately and independently from any federal

---

[12] The Court has thus dismissed all of Stinson's federal claims.  The question becomes on what
basis the Court may exercise subject-matter jurisdiction over Stinson's state- and local-law
claims.  *See Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010) ("Courts have an independent
obligation to determine whether subject-matter jurisdiction exists, even when no party challenges
it.").  Although Stinson brought this case asserting both federal-question jurisdiction and
diversity jurisdiction, *see* Compl. ¶ 6, she has not sufficiently established complete diversity, *see
Herrick Co. v. SCS Commc'ns, Inc.*, 251 F.3d 315, 322-23 (2d Cir. 2001) ("[T]he party seeking
to invoke jurisdiction under 28 U.S.C. § 1332 bears the burden of demonstrating that the grounds
for diversity exist and that diversity is complete." (citation omitted)).  Stinson identifies herself
as a New Jersey resident.  *Id.* ¶ 4.  Morningstar identifies itself as a Pennsylvania limited-liability
company with its principal place of business in New York.  *Id.* ¶ 5; Ans. ¶ 5.  But a limited-
liability company "takes the citizenship of each of its members," *Bayerische Landesbank, N.Y.
Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012), and the citizenship of
Morningstar's member(s) is unclear, *cf.* Dkt. 17 (Morningstar's Rule 7.1 statement).

Even if Morningstar may be deemed a citizen of New Jersey, however, the Court may continue
to exercise supplemental jurisdiction over Stinson's state- and local-law claims.  To be sure, the
general rule is that "where the federal claims are dismissed before trial, the state claims should
be dismissed as well."  *Jusino v. Fed'n of Cath. Tchrs., Inc.*, 54 F.4th 95, 107 (2d Cir. 2022)
(citation omitted).  But this is not an absolute rule.  The Court finds that given the progress of the
litigation to date and under the facts of this case, "the values of judicial economy, convenience,
fairness, and comity" favor the continued exercise of supplemental jurisdiction over Stinson's
state- and local-law claims even after dismissing her federal claims.  *Klein & Co. Futures, Inc. v.
Bd. of Trade of City of N.Y.*, 464 F.3d 255, 262 (2d Cir. 2006); *see, e.g., Kroshnyi v. U.S. Pack
Courier Servs., Inc.*, 771 F.3d 93, 102 (2d Cir. 2014) ("[T]he district court did not abuse its
discretion" by retaining supplemental jurisdiction over state-law claims because, by the time the

and state law claims" and "constru[e] the NYCHRL's provisions 'broadly in favor of

discrimination plaintiffs, to the extent that such a construction is reasonably possible.'" *Mihalik*

*v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (quoting *Albunio v.*

*City of New York*, 947 N.E.2d 135, 137 (N.Y. 2011)).  "Thus, even if the challenged conduct is

not actionable under federal and state law, federal courts must consider separately whether it is

actionable under the broader New York City standards." *Id.*

   As for Stinson's NYSHRL claims, employment-discrimination claims under that statute

have long been "analyzed identically to claims under Title VII." *Cooper*, 819 F.3d at 680 n.3

(ellipsis omitted) (quoting *Brennan*, 192 F.3d at 316 n.2); *accord Ferrante v. Am. Lung Ass'n*,

687 N.E.2d 1308, 1311 (N.Y. 1997).  But "[t]he New York State Legislature passed several

amendments to the NYSHRL in June 2019, the effect of which is to render the standard for

claims closer to the standard of the NYCHRL." *Livingston v. City of New York*, 563 F. Supp. 3d

201, 232 n.14 (S.D.N.Y. 2021).  "Significantly, however, these amendments only apply to claims

that accrue on or after the effective date of October 11, 2019." *Id.*

   "The case law . . . has yet to definitively resolve whether the NYSHRL's liability

standard is now coextensive with that of the NYCHRL, or whether it requires more, so as to

impose a standard between federal and city law." *Wheeler v. Praxair Surface Techs., Inc.*, 694

F. Supp. 3d 432, 451 (S.D.N.Y. 2023).  The parties' briefs do not meaningfully engage with this

issue.  That said, New York courts have implied that the standards for employment-

discrimination claims under the NYSHRL and the NYCHRL are now largely the same.  *See, e.g.*,

*Syeed v. Bloomberg L.P.*, 235 N.E.3d 351, 355-56 (N.Y. 2024) (treating the NYSHRL and the

---

federal claims were dismissed, "discovery had been completed, dispositive motions had been
submitted, and the case would soon be ready for trial.").

NYCHRL as coextensive in protecting nonresidents who are not yet employed but have proactively sought an actual state- or city-based job opportunity); *cf. Alshami v. City Univ. of N.Y.*, 162 N.Y.S.3d 720, 720 n.1 (1st Dep't 2022) ("[B]ecause [the] plaintiff's claims under the [NYS]HRL accrued before the enactment of [the 2019 amendments], the standard for the discrimination claim under the [NYS]HRL differs from the standard for the discrimination claim under the [NYC]HRL."). These signals – in conjunction with the fact that "the language of the NYSHRL is now nearly identical to that of the NYCHRL," *Cannizzaro v. City of New York*, 206 N.Y.S.3d 868, 884-85 (Sup. Ct. 2023); *see Hosking v. Mem'l Sloan-Kettering Cancer Ctr.*, 126 N.Y.S.3d 98, 102 n.1 (1st Dep't 2020) – suggest that the NYSHRL and the NYCHRL are coextensive, at least as to conduct after October 11, 2019, *see Wheeler*, 694 F. Supp. 3d at 452 (assuming that the amended NYSHRL imposes the same hostile-work-environment standard as that of the NYCHRL).

Out of an abundance of caution, the Court will assume for the purposes of this motion that the amended NYSHRL tracks the NYCHRL, without prejudice to Morningstar's right to later attempt to demonstrate that the NYSHRL sets a more rigorous standard or that Stinson's claims are based on conduct before October 11, 2019. To the extent that Stinson's NYSHRL claims rely on conduct that occurred after October 11, 2019, the Court will analyze those claims under the same standard as that for her NYCHRL claims.

### A. Timeliness

"Claims under the NYSHRL and the NYCHRL are time-barred unless filed within three years of the alleged discriminatory acts." *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 238 (2d Cir. 2007). The NYSHRL's "three-year statute of limitations is tolled during the period in which a complaint is pending before the New York State Department of Human Rights or with the EEOC." *Banks*, 81 F.4th at 260. Similarly, "[a]lthough the Second Circuit has not yet

resolved the question of whether EEOC charges toll the statute of limitations for NYCHRL

claims, the weight of authority in this District holds that EEOC charges do toll NYCHRL

claims." *Murillo-Roman v. Pension Bds-United Church of Christ*, No. 22-cv-08365 (JLR), 2024

WL 246018, at *8 (S.D.N.Y. Jan. 23, 2024) (quotation marks and citation omitted).  Therefore,

Stinson's state-law claims are tolled by the filing of her EEOC charge, extending her time to file

such claims by the 624 days during which her charges were pending with the EEOC to

November 3, 2017 – three years and 624 days before Stinson filed her complaint in this Court.

### B.  Discrimination

"The standard for a discriminatory act under the NYCHRL is more lenient than the

federal standard.  A plaintiff need only show that she was 'treated . . . less well, at least in part

for a discriminatory reason.'"  *Verne v. N.Y.C. Dep't of Educ.*, 697 F. Supp. 3d 30, 59-60

(S.D.N.Y. 2023) (citation omitted).  "Under this standard, the conduct's severity and

pervasiveness are relevant only to the issue of damages."  *Mihalik*, 715 F.3d at 110.

Nevertheless, "the NYCHRL is not a 'general civility code,'" and Stinson "still bears the burden

of showing that the conduct is caused by a discriminatory motive."  *Id.* (quoting *Williams v.

N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 40 (1st Dep't 2009)).  "It is not enough that a plaintiff has

an overbearing or obnoxious boss.  She must show that she has been treated less well at least in

part '*because of* her [protected characteristic].'"  *Id.* (quoting *Williams*, 872 N.Y.S.2d at 39); *see

Verne*, 697 F. Supp. 3d at 60 ("It is sufficient to 'show differential treatment of any degree based

on a discriminatory motive.'" (quoting *Gorokhovsky v. N.Y.C. Hous. Auth.*, 552 F. App'x 100,

102 (2d Cir. 2014) (summary order))).

For substantially the same reasons stated above for Stinson's Title VII and ADEA claims,

Stinson has not shown from her 2020 PIP or her termination that she "has been treated less well

[by Morningstar] at least in part because of" any protected characteristic.  *Mihalik*, 715 F.3d at

110 (emphasis, quotation marks, and citation omitted). Despite her focus on Employee 1 and Dittmer's "making a file" comment, Stinson provides no evidence to suggest that she was placed on the 2020 PIP or terminated because of her gender. Her age-discrimination claims similarly fail because she offers no admissible evidence to suggest that Morningstar had a pattern of targeting older workers.

The Court turns with fresh eyes to Stinson's discrimination claims arising out of acts otherwise time barred under Title VII and the ADEA, including her 2017 PIP and reduced bonus in February 2018. Here, Stinson has presented enough evidence to survive summary judgment on her age-discrimination claims. Stinson claims she heard Overby – who placed her on the 2017 PIP – dismiss a job candidate as "way too old." JSOF ¶ 20. Stinson also asserted that Overby had excluded her and another older colleague from a team dinner, *see* Df. RSOF ¶ 285; Dkt. 58-22. Overby's statement, before placing Stinson on the 2017 PIP, that "we would like to see her gone shortly after the end of the one-month PIP" further illustrates an unwillingness, at least by Overby, to give Stinson an opportunity to succeed at Morningstar. Df. RSOF ¶ 246. This evidence creates an issue of fact as to whether Overby treated Stinson differently because of her age. It also shows pretext as to Stinson's NYSHRL age-discrimination claim by suggesting that Stinson's 2017 PIP was a mere formality before her eventual termination. *Cf. Steele-Hegg*, 2007 WL 1989434, at *11 (fact that supervisor compared plaintiff's performance to the goals in her PIP "*before* the time period to complete the directives had expired, creates a genuine issue of fact as to whether defendant's true motive was discriminatory"). Therefore, the Court denies summary judgment to Morningstar on Stinson's age-discrimination claims under the NYSHRL and NYCHRL as to her 2017 PIP and her reduced bonus in 2018.

Stinson's state-law sex-discrimination claims, however, do not survive summary judgment. The evidence that Overby treated Stinson differently because of her age do not contain any reference to gender. The job candidate that Overby dismissed as "too old" was a woman. JSOF ¶ 20. And in the same email where Overby stated that she would like to see Stinson "gone," she added in the next sentence: "While we will need to backfill Celeste, perhaps we can think of Audrey [Lee] as Celeste's backfill in a way?" Dkt. 58-11 at 2. That Overby, a woman, sought to replace Stinson with another woman is not evidence of age discrimination. *See Hill v. Bloomberg L.P.*, No. 14-cv-09809 (CM), 2016 WL 1665599, at *13-14 (S.D.N.Y. Apr. 20, 2016) (dismissing NYSHRL and NYCHRL gender-discrimination claims on summary judgment where supervisor fired plaintiff, a man, and replaced him with other men); *DeJesus v. Dist. One Cmty. Educ. Council*, No. 08-cv-10666 (GBD), 2010 WL 3959624, at *4 (S.D.N.Y. Sept 14, 2019) ("The fact that plaintiff's immediate replacement is of the same protected classes effectively precludes plaintiff from establishing that her termination occurred under the requisite circumstances giving rise to an inference of discrimination."). Any gender-related comments alleged by Stinson were non-actionable stray remarks made years before her 2017 PIP by co-workers who played no part in placing her on that PIP. *See, e.g.*, *Moore v. Verizon*, No. 13-cv-06467 (RJS), 2016 WL 825001, at *9 (S.D.N.Y. Feb. 5, 2016) (age-discrimination case based on stray remarks was not actionable under the NYCHRL); *Rodriguez v. City of New York*, No. 09-cv-01378 (KAM), 2011 WL 3610751, at *12 (E.D.N.Y. Aug. 16, 2011) (granting summary judgment to defendant on NYCHRL age-discrimination claim where "the allegedly ageist comments occurred too temporally distant from plaintiff's termination" five months later), *aff'd*, 484 Fed. App'x 637 (2d Cir. 2012) (summary order).

To the extent that Stinson stakes her state-law sex-discrimination claims on Morningstar's denial of her request to work from home, such claims rely entirely on her observation that Employee 1, who lived in Horsham, was allowed to work from home three days a week. Pl. RSOF ¶ 104. Stinson neglects to explain, however, how she and Employee 1 are similarly situated with respect to their commutes. *See Cooper v. Templeton*, 629 F. Supp. 3d 223, 230-31 (S.D.N.Y. 2022) (dismissing plaintiff's claims because purported comparators were not alleged to be "similarly situated in terms of," among other things, "geography"), *aff'd sub nom. Cooper v. Franklin Templeton Invs.*, No. 22-2763, 2023 WL 3882977 (2d Cir. June 8, 2023) (summary order). To the contrary, Stinson acknowledges that Morningstar denied the request because it believed her commute – which "involved a short drive to the New Jersey Transit train station in northwestern New Jersey, and a ride on the New Jersey transit," Pl. RSOF ¶ 106 – was shorter than Employee 1's commute of "2+ hour[s]," Dkt. 58-27. She also acknowledges that Morningstar allowed her to work from home when she broke her foot in October 2018. Df. RSOF ¶ 298. That one male coworker was allowed to work from home while Stinson was not so permitted does not, without more, amount to "even minimal evidence of gender discrimination." *Karupaiyan v. CVS Health Corp.*, No. 19 Civ. 8814 (KPF), 2021 WL 4341132, at *21 (S.D.N.Y. Sept. 23, 2021) (dismissing NYCHRL gender-discrimination claim); *Christoff v. Saturn Bus. Sys.*, No. 10-cv-08505 (CS), 2013 WL 394131, at *7 (S.D.N.Y. Feb. 1, 2013) (plaintiff not similarly situated to male comparator where male's commute was markedly longer than plaintiff's).

No reasonable jury could conclude that any poor treatment of Stinson could be attributed to discriminatory intent based on sex. On these claims, the Court grants summary judgment to Morningstar.

### C. Retaliation

Courts assess NYCHRL (and post-amendment NYSHRL) retaliation claims under a modified version of the *McDonnell Douglas* burden-shifting framework. *See Ya-Chen Chen*, 805 F.3d at 75. "The third element of a *prima face* retaliation claim under the NYCHRL is more forgiving than that of its federal and state counterparts, at least on its face." *Shkoza v. NYC Health & Hosps. Corp.*, No. 20-cv-03646 (RA), 2024 WL 1116145, at *6 (S.D.N.Y. Mar. 13, 2024). "Unlike retaliation claims brought under federal and state civil rights laws, a NYCHRL plaintiff need not show a material adverse action but instead can prove a retaliation claim by demonstrating that '[he] took an action opposing [his] employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action.'" *Livingston*, 563 F. Supp. 3d at 246 (quoting *Mihalik*, 715 F.3d at 112). The fourth element of a *prima facie* retaliation claim also differs in that the plaintiff need not prove that the "adverse action would not have occurred [but for] the retaliatory motive," *Zann Kwan*, 737 F.3d at 846, only that discrimination or retaliation played some role in the defendant's action, *see Ya-Chen Chen*, 805 F.3d at 76; *Mihalik*, 715 F.3d at 110 n.8. "Despite these distinctions, the [*McDonnell Douglas*] analysis otherwise proceeds in a similar manner." *Shkoza*, 2024 WL 1116145, at *6. "Even under this 'less demanding standard,' the plaintiff . . . must show that a defendant's legitimate reason for [her] termination was pretextual or motivated at least in part by an impermissible motive." *Livingston*, 563 F. Supp. 3d at 246 (quoting *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 449 (S.D.N.Y. 2018)).

As with her other retaliation claims, Stinson fails to establish a *prima facie* case or meaningfully respond to the proffered legitimate reasons for her termination. She has not established a causal connection between her alleged protected activities and her termination.

Other than Dittmer's comment in August or September 2019 that he was "making a file on Celeste," Stinson puts forth no evidence that her termination over five months later had any connection to Dittmer's request for documentation.

Even if Stinson had established a *prima facie* case of retaliation, she fails to meaningfully call into question Morningstar's "legitimate reasons" for her termination. *Ya-Chen Chen*, 805 F.3d at 76. All of the evidence in the record indicates that Stinson's termination was the consequence of continued mistakes in her work and a communication style that her managers deemed insubordinate. *See Mazur v. N.Y.C. Dep't of Educ.*, 621 F. App'x 88, 90 (2d Cir. 2015) (summary order) (affirming dismissal of NYCHRL retaliation claim due to "a lack of the requisite causal link between [plaintiff's] complaints and any alleged retaliatory action," and where "the record contains numerous non-retaliatory reasons for any action taken against [plaintiff]"). For these reasons, the Court grants summary judgment to Morningstar on Stinson's NYCHRL and NYSHRL retaliation claims.

### D. Hostile Work Environment

"Under the NYCHRL, the standard for a hostile-work-environment claim is the same as for a discrimination claim." *Doolittle v. Bloomberg L.P.*, No. 22-cv-09136 (JLR), 2023 WL 7151718, at *8 (S.D.N.Y. Oct. 31, 2023); *see Verne*, 697 F. Supp. 3d at 61 ("The NYCHRL dispenses with the federal 'severe and pervasive' test; instead, a plaintiff bringing a hostile work environment claim under New York City law must 'prove by a preponderance of the evidence that she has been treated less well than other employees because of her protected status.'" (brackets omitted) (quoting *Williams*, 872 N.Y.S.2d at 39)). Thus, for the reasons stated above as to her NYCHRL discrimination claim, the Court denies summary judgment on Stinson's age-related hostile-work-environment claim under the NYCHRL.

However, because the conduct on which the Court denies summary judgment – Stinson's 2017 PIP and 2018 reduced bonus – occurred before October 11, 2019, Title VII's standard applies to Stinson's NYSHRL hostile-work-environment claim.  *See Wheeler*, 694 F. Supp. 3d at 452.  As previously discussed, the evidence of the work environment that Stinson experienced at Morningstar, as of October 11, 2019, does not support a hostile-work-environment claim under the Title VII standard.  *See id.* at 452-55 (first analyzing hostile-work-environment claim based on conduct up to October 11, 2019, then examining whether the evidence of workplace conduct after the amendment, viewed in the nonmovant's favor, is sufficient to satisfy the lower NYCHRL standard).  After that date, the only relevant conduct is Stinson's 2020 PIP and her termination, which, also for the reasons stated above, are inadequate to establish a hostile work environment under the NYCHRL.  Therefore, the Court grants summary judgment to Morningstar on Stinson's NYSHRL hostile-work-environment claim.

## CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Morningstar's summary-judgment motion:

- Stinson's Title VII and ADEA claims are dismissed in their entirety;

- Stinson's sex-related discrimination claims under the NYSHRL and NYCHRL are dismissed; and

- Stinson's NYSHRL hostile-work-environment claim is dismissed.

This case shall now proceed to a jury trial on Stinson's surviving claims against Morningstar: her NYSHRL and NYCHRL age-related discrimination claims and her NYCHRL age-related hostile-work-environment claim.  The Court directs the parties to promptly confer,

and, within 60 days of this decision, submit a joint pretrial order and other pretrial submissions consistent with the Court's Individual Rules 5(A) and 5(B) governing jury trials.

The Clerk of Court is respectfully directed to terminate the motions at Dkt. 39.

Dated: August 16, 2024
New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge